WLODYSLAUS ROMAN, a Minor, etc., *Appellant*, v. THE CITY OF LEAVENWORTH, *Appellee*.

No. 18,342.

### SYLLABUS BY THE COURT.

1. ATTRACTIVE NUISANCE—*City Dump—Erroneous Instructions.* In an action for damages alleged to have been sustained by a boy eleven years old while playing on a city dump, by falling into a smouldering fire—such dump being clearly an attractive nuisance—the court gave correct instructions at the request of the plaintiff, but also gave several at the request of the defendant which were erroneous. *Held*, that as the jury, which found for the defendant, were as likely to be influenced by the wrong as by the right instructions, the plaintiff has not had his case presented under a proper interpretation of the law, and a new trial should be granted.

2. —— *Maintenance of, Not its Establishment, Material.* In such a case the maintenance of the dump by·the city and not its establishment was material, and the city was required to use reasonable care to keep children away and from being injured there.

3. —— *Insufficient Warning—Instructions.* Such dump being in charge of a boss employed by the city, it was material whether or not he, with the knowledge and acquiescence of. the city, exercised control over the whole dump rather than whether or not he had express authority so to do. A mere warning to the plaintiff to be careful, uttered by a private person engaged in unloading spoiled fruit at such dump, would not relieve the city from liability even if the plaintiff was sufficiently intelligent to appreciate the danger of going over the embankment, which formed a part of the dump, after spoiled fruit, but proceeded and sustained injuries "at a place where a prudent person would not anticipate any one would

go," if the testimony should show that the place where the injury occurred was a smoldering fire of some weeks' probable duration, over the embankment, of which fire the plaintiff had no knowledge.

Appeal from Leavenworth district court. Opinion filed July 5, 1913. Reversed.

*Arthur M. Jackson,* of Leavenworth, for the appellant.

*Benjamin F. Endress,* and *C. P. Rutherford,* both of Leavenworth, for the appellee.

The opinion of the court was delivered by

WEST, J.: The plaintiff, by his next friend, sued to recover damages for injuries sustained while playing on the city dump. The jury returned a verdict in favor of the defendant, and the plaintiff appeals and complains principally of certain instructions given over his objection.

The defendant appears to contend that the dump in question was not an attractive nuisance within the principles of former decisions by this court. The testimony of various little boys who played about the place furnishes a most graphic and unmistakable picture of an attractive nuisance within the principles of all the decisions which recognize such a thing. It appears that the dump is located at the foot of Second street and a man named Haley, known as boss of the dump, is employed by the city at a monthly salary and his duties require him to be at the place from eight o'clock until five, and he testified that:

"The whole city comes out there with stuff. The city carts haul garbage and rubbish there to dump it. There is no other place of that kind in the city. I have a little shanty on the dump. It was built by the city."

The superintendent of streets testified that one of the duties of the man in charge of the dump was to keep the stuff pushed back into the river.

"There are railroad tracks on the west side of the dump. Nearly all of the dump is on the right of the track. The chute is located near the center of the dump. There was also a butting board about twelve or fourteen feet north of the chute. When manure or anything of that kind accumulates on the dump it catches fire and during last summer it was on fire several times. . . . We never had a guard or fence on either side of the chute or dumping board. . . . I can not say just how long the fire was burning before the little boy got burned. Fire would catch along there, and, as a rule, we would shove manure and other stuff into it and let it catch fire. The fire that burned the little boy might have been burning for three or four weeks before that time or it might have been burning longer. The fire was usually a smoldering one. There was never a visible blaze. . . . There are no fences or guards on the railway tracks and the boys or any person could walk right in there."

Sylvester Kozmin, aged nine, testified that he knew the plaintiff and was at the dump the morning he got burned. Two others were with him. He further testified:

"I was there when 'Jimmie' got into the fire. He was going after a watermelon when he fell into the fire. Mrs. Palka helped to get him out of the fire. I saw her pull him out. . . . I went down there nearly every day for about a month before this happened. I saw other boys there. They got slop down there. . . . There was a man there unloading watermelons. He threw out a watermelon and 'Jimmie' tried to get down after it. He was trying to beat me to it. The watermelon rolled down into the river and 'Jimmie' fell into the fire hole."

The plaintiff testified that he was eleven years old, was at the dump on July 10, 1911. His mother had told him to go to the store, and when he got there some of the boys told him they had found some money on the dump, "so I was going there and find some money. . . . I was running around on the dump and I saw a watermelon down there and was going to jump after

it.   I seen nothing of the fire and I jumped into the
fire.   This fire was on the north side of the chute, about
half way between the top and the water.   I did n't
see any fire.   It did not even smoke.   I did not know
there was any fire there.   I had never been down
there more than once before that time.   I could not
get out of the fire.   I was hollering for somebody to
get me out, and Mrs. Palka came up and helped pull
me out.   I got burned up above my ankles.   I saw Mr.
Haley there that day.   He never told me to stay away.
I did not know it was dangerous to play there."   He
further testified that after the doctor put oil on his
feet he put cotton on them, and when he took the
bandages off the skin came off.   He also said:

"The soles of my feet came off.   They hurt me all
the time.   I can not bend the toes on my left foot, but
can bend them on the right one.   I can not walk on my
feet except with crutches.   I have not been able to walk
on them since I was burned.   I did n't walk on them at
all for about four months after I was burned.   I can
not go to school, but I went to school before I was
burned.   I can not sleep at nights.   I don't feel as well
since I was burned; by head hurts me and I have pains
in my stomach."

The court appointed certain physicians to examine
the plaintiff's injuries and one of them testified that
when he entered the room where the plaintiff was the
boy was sitting with his feet on the first round of a
chair, with rather a cheerful smile upon his face and
looking rather contented.   He further advised the
court, however, that when he asked the boy to undress
his feet he did so, "and the moment he got the rags off
his feet he commenced to squeal.   I could not make an
examination.   When I approached to touch him he
would holler and when I took hold of his feet he would
jerk them away from me.   The feet themselves showed
rather a recent burn that had been very well treated
by some doctor."   It was sought to show by another

physician that judging from the general healthy appearance and sparkling black eyes and the apparent jovial condition of the plaintiff he was probably not suffering from insomnia. It appears from the testimony of another witness that the two physicians who examined the boy proceeded to blindfold him and one of them "grabbed hold of his leg right underneath and tried to press his bare finger in there," with the somewhat natural result that the boy began to scream and said that it hurt. It would seem quite clear, therefore, whether or not the apparent cheerfulness of this eleven-year-old boy several months after receiving the injury was sufficient to overcome his statement of inability to sleep nights, that he was certainly suffering from exactly the sort of burn he had testified about.

One of the instructions complained of was to the effect that if the city did not establish the entire place in question as a dump, but only so much thereof as was occupied by the chute, it was under no legal duty to keep the whole place in a safe condition, and if the place where the plaintiff was injured was not established by the city then the verdict must be for the defendant. It was a question not of establishment but one of maintenance, and if the place where the plaintiff was injured was a part of the dump maintained and operated by the city it could make no difference as to who established that portion of the place. Another was to the effect that if the dump boss assumed control of the whole of the dumping ground without express authority from the proper officials of the city the defendant could not be held liable for any act of negligence on his part in caring or failing to care for the whole of the dumping place, including the point at which the plaintiff was alleged to have been injured. On the contrary, if the dump boss without express authority from the proper officials assumed control of the whole dump and exercised it for a long period of time with their knowledge and acquiescence, it would not be necessary to show ex-

press authority. (*Roberts v. St. Marys,* 78 Kan. 707, 98 Pac. 211.) Another was to the effect that if, when the plaintiff went upon the dump, the person in charge was engaged in the performance of his duties, and that a wagon not in the employ of the city was unloading spoiled fruit and throwing it over the embankment into the river, and while this was being done the plaintiff, with others, assembled about the wagon near the top of the embankment and proceeded to pick up spoiled fruit, and the person in charge of the wagon warned the plaintiff to be careful, and the plaintiff possessed sufficient intelligence to know and appreciate the danger of going over the embankment after spoiled fruit but proceeded down the embankment and sustained the injuries "at a place where a prudent person would not anticipate any one would go, then I instruct you that the plaintiff can not recover and your verdict must be for the defendant." This instruction apparently loses sight of the city's duty to use reasonable care to keep young boys away from the dump. It can hardly be said that if the driver of a private wagon should simply warn a boy eleven years old to be careful, and the boy nevertheless should go over the bank and step into a smoldering fire, that the city would be relieved from liability merely because the boy sustained injuries "at a place where a prudent person would not anticipate any one would go."

The court gave the law properly in instruction No. 4, wherein the jury were told that if for several weeks or more immediately before the date of the injury different fires had been burning in the dump and because of the existence of such fires the dump was a dangerous place for plaintiff and other children of tender years to play or venture upon, and the defendant with knowledge of these facts and with knowledge that the plaintiff and other children of tender years had for a period of several weeks or more been in the habit of playing or venturing thereon or thereabout and took no reason-

able precaution to keep the plaintiff away from the dump or fire in question or to prevent injury to him or to prevent him from falling into the fire while engaged in play or adventure thereon or thereabout, the defendant would be liable for injuries by reason of such negligence without any contributory negligence on the part of the plaintiff. And in instruction No. 5, in which the jury were told substantially the same and that the defendant would be liable if the plaintiff, because of his tender years and immature judgment, did not know that it was dangerous for him to play or venture near the dump or fire hole, or was not guilty of contributory negligence in so doing.

Other alleged errors occurring upon the trial are complained of, but we do not deem them of sufficient materiality to require consideration. While the instructions given at the request of the plaintiff were correct, the errors already referred to in those given at the request of the defendant were as likely to influence the jury as the former, and having been given it can not be said that the plaintiff has had his case presented to the jury under a proper interpretation of the law.

The judgment is therefore reversed and the cause remanded with directions to grant a new trial.