No. 25,050.

Larson Brothers Wholesale Grocery Company, *Appellee*, v. The City of Kansas City, H. N. Strait Manufacturing Company and Thomas M. Torson, *Appellants*.

SYLLABUS BY THE COURT.

1. Joint Tort-feasors—*Damages from Concurrent Wrongdoing—Joint and Several Liability*. The rule followed that where two or more parties by their concurrent wrongdoing cause injury to a third, they are jointly and severally liable and the injured party may, at its option, institute an action and recover against one or all of those contributing to the injury.

2. Canned Goods—*Damages by Sewer Water—Measure of Damages*. A wholesale grocery company had canned goods damaged by sewer water which came in contact with them by the negligence of another. It repaired the damage as much as possible by polishing, relabeling and repacking the cans.

The court instructed that the measure of damages was the difference between the value of the goods immediately before the damage and their value after the repairs were made, plus the reasonable cost of the repairs. *Held,* to be a fair measure of damages applicable to this case.

Appeal from Wyandotte district court, division No. 1; EDWARD L. FISCHER, judge. Opinion filed March 8, 1924. Affirmed.

*H. J. Smith, William Drennan, Willard M. Benton, Joseph A. Lynch, A. B. McWilliams, Guy Stanley,* and *A. L. Berger,* all of Kansas City, for the appellants.

*David F. Carson,* and *C. A. Miller,* both of Kansas City, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: This is an action for damages against three defendants charged as joint tort-feasors. The jury answered special questions and returned a general verdict for plaintiff against all the defendants. Two defendants have appealed.

Plaintiff is a wholesale grocery company and had a warehouse at Kansas City, Kan., in the basement of which it kept for sale and distribution a large quantity of canned goods. The basement was connected with what is known as the Ohio avenue sewer, which had been constructed by the city. Prior to the contract, soon to be mentioned, this sewer terminated at the state line on Ohio avenue and from there the sewage flowed through an open channel along the state line into the Missouri river. In April, 1917, the city of Kansas City entered into a written contract with Thomas M. Torson, a contractor, by which Torson was to continue the sewer to the Missouri river. The elevation was such that the sewage would flow into the river from the sewer at times when the water was low in the river, but when the river was at flood stage it would not do so, thereby stopping the sewer and flooding the river water into it. To avoid this, the contract provided that Torson should erect two wells at the terminus of the sewer and construct a pump house and install therein a pump of a designated capacity, sufficient to pump a certain number of cubic feet of sewage per minute against a pressure of a thirty foot head of water in the river, it being determined that was the maximum height to which the river would rise at flood time. The contract provided that:

"A thorough test of pump and motor shall be made after installation and before payment to contractor. This test shall be conducted as near as possible under actual working conditions, at which time the entire equipment

working as a complete plant shall make a performance required by specifications and satisfactory to the city engineer."

Torson constructed the sewer and built the wells and the pump house. He contracted with the H. N. Strait Manufacturing Company to build a pump to comply with his contract with the city. The pump was built and installed. The two wells were constructed adjacent to each other, separated by a wall in which, near the bottom, was an opening, through which the sewage could pass when the river was low and which could be closed when the river would rise. To test the capacity and sufficiency of the pump and "the entire equipment working as a complete plant," it was thought best not to wait until an actual flood in the river occurred but to "create a flood" or flood conditions, by filling the wells or one of them to the desired height and operating the pump, thus testing it under the actual working conditions it was designed to handle.

Two tests were made which, for one reason or another, were not satisfactory. The H. N. Strait Manufacturing Company then built a bulkhead and placed it in the opening between the two wells and arranged for a third test. This bulkhead was installed and the arrangements for the test made under the direction of Mr. McLaughlin, their foreman. This bulkhead was constructed of heavy timbers which could be left in place, but with a trap door to let the sewage or water through and which could be opened from the top of the well by a rope. The day for the test was set and McLaughlin notified the contractor, Torson, and he notified the city engineer and some other city officials and they were all present. They proceeded to "create a flood" by filling the well which connected directly with the sewer. The water got so high, possibly because of a delay in removing the bulkhead between the two wells or opening of the trap door therein, that it forced its way back through the sewer, thereby flooding the floor of the plaintiff's basement with sewage to a depth varying from two inches to a foot, thus causing damage. To recover for this damage plaintiff sued the city, Torson, and the H. N. Strait Manufacturing Company. The jury returned answers to special questions as follows:

"1. Was there a contract entered into between defendant T. M. Torson and the City of Kansas City, Kansas, on the 17th day of April, 1917, whereby said Torson was to construct a 42-inch reinforced concrete sewer in the Ohio sewer district? Answer: Yes.

"2. Under said contract between defendant Torson and the city, was defendant Torson to furnish a pump as a part of the construction of said sewer? Answer: Yes.

"3. Did defendant Torson and defendant H. N. Strait Mfg. Co. enter into a contract whereby the H. N. Strait Mfg. Co. agreed to furnish a centrifugal pump f. o. b. H. N. Strait Manufacturing Company's shop? Answer: Yes.

"4. Under the contract between defendant Torson and the city, was a test to be made of the pump and motor satisfactory to the city engineer? Answer: Yes.

"5. Did defendant Torson place a bulkhead in said sewer prior to the time H. N. Strait Mfg. Co. put in a bulkhead? Answer: Yes.

"6. Did the city accept the tests made at the time Torson placed the bulkheads in the sewer? Answer: No.

"7. In order to make such test as provided for under said contract, did the defendant city and Torson consent to H. N. Strait Manufacturing Company building a bulkhead and placing a bulkhead in the sewer for the purpose of making such test? Answer: Yes.

"8. Was the test as finally made, performed and executed in the presence of the representatives of the city and defendant Torson? Answer: Yes.

"9. Did the city or Torson immediately prior to the making of such test, object to the bulkhead or the manner of its construction? Answer: No.

"10. Was the final test and preparations therefor (*a*) made in the presence of the representatives of the city and Torson and (*b*) was the test made pursuant to the contract between the city and Torson? Answer: (*a*) Yes. (*b*) Yes.

"11. Was the manner of making the test and building or placing the bulkhead in the sewer approved by the city engineer? Answer: By assenting.

"13. What was the purpose of the defendant, H. N. Strait Mfg. Co., in testing the pump? Answer: To fulfill contract with Torson.

"14. Did the defendant Torson supervise and direct the manner in which the H. N. Strait Mfg. Co. was to make the test? Answer: No.

"15. Who do you find, from the evidence, obstructed or blocked the sewer in question? Answer: H. N. Strait with the assent of city and Torson.

"16. What do you find the fair market value of the goods in question to have been immediately before the influx of the water into the basement of the Larson Brothers Wholesale Grocery Company. Answer: $1,567.01.

"17. What do you find the fair market value of the goods in question was after the work of cleaning and overhauling had been performed by the plaintiff? Answer: $783.50.

"18. What do you find the cost to the plaintiff was, for overhauling, cleaning and relabeling the goods in question? Answer: $425.00.

"19. What do you find the expense of the plaintiff to have been for work and labor in cleaning up the premises after the influx of said water? Answer: $95.00."

There was a general verdict for plaintiff for $1,303.50 against all of the defendants and judgment was rendered accordingly. The city and the H. N. Strait Manufacturing Company have appealed and filed separate abstracts and briefs. Torson did not appeal. There appears to be no serious contention that the plaintiff did not

sustain damages for which he is entitled to recover from some one, though there is a question as to the proper measure of damages, which will be discussed later, but each of the appellants contends that it is not liable. Appellee contends that the defendants were joint tort-feasors and that all of them are liable.

The rule is well settled that where two or more parties by their concurrent wrongdoing cause injury to a third party, they are jointly and severally liable. *Osage City v. Larkin,* 40 Kan. 206, 19 Pac. 658; *Kansas City v. Slangstrom,* 53 Kan. 431, 36 Pac. 706; *Railway Co. v. Merrill,* 61 Kan. 671, 678, 60 Pac. 819; *Arnold v. Milling Co.,* 86 Kan. 12, 119 Pac. 373; *Luengene v. Power Co.,* 86 Kan. 866, 122 Pac. 1032; *McDaniel v. City of Cherryvale,* 91 Kan. 40, 136 Pac. 899; *Rogers v. City of Coffeyville,* 95 Kan. 171, 147 Pac. 816; *Pinson v. Young,* 100 Kan. 452, 455, 164 Pac. 1102.

The findings of the jury bring all of the defendants within this rule. The evidence sustains the findings. It was specifically provided in the contract between the city and Torsen that after the pump was installed a thorough test should be made of the entire equipment working as a complete plant. This means, not the pump alone, but the motor, which was not furnished by the Strait Manufacturing Company, and the wells with their sewer connections and the opening between them, and the means of closing this opening. This test was to be made "as near as possible under actual working conditions," which the parties interpreted to mean with a water head of thirty feet in one of the wells. This was to be done to the satisfaction of the city's engineer, and he testified that he required that kind of a test. So the city cannot be heard to say that it had nothing to do with this test. But the city contends, it had let a contract for the work to an independent contractor, Torson, and that Torson had all the responsibility in the matter. A similar claim was made by the city in *Rogers v. City of Coffeyville,* supra, but the court said: "The city owed the plaintiff an independent, original and primary duty to keep its streets in reasonably safe condition for use." So here, the city owed plaintiff an independent, original, primary duty not to create, or permit to be created under its direction, a condition that would cause him injury. See, also, *Reed v. Peck, Guitar and Watson,* 163 Mo. 333, quoting with approval from *McMannus v. Lee,* 43 Mo. 206:

38—115 Kan.

"That any person who is present at the commission of a trespass, encouraging or exciting the same by words, gestures, etc., . . . or who in any way or by any means countenances or approves the same, is in law deemed to be an aider and abettor, and liable as a principal." (p. 337.)

Torson is liable, for, under his contract, he had to make this test to the satisfaction of the city's engineer before he could get his payment under his contract, and he cannot be heard to say that he had nothing to do with it. Indeed, he makes no serious contention of that kind, and did not appeal from the judgment against him.

The H. N. Strait Manufacturing Company contends that it is not liable for the reason that it had no contract with the city—its contract was with Torson—that in building the bulkhead it was a mere volunteer, as its contract with Torson required it to build and deliver the pump, only. Plaintiff sued on tort, not on contract. The question is, was this appellant present participating in doing the thing which caused injury to plaintiff? The jury found that it was and its finding is abundantly sustained by the evidence. But, this appellant contends that its foreman, Mr. McLaughlin, did not know that the water was likely to back up in the sewer and cause damage. The evidence does not sustain this contention. McLaughlin testified, "I knew at one time before, we had trouble with Fowler's" and the mayor and city engineer testified that on the day in question a danger line was marked upon the well and McLaughlin's attention called to it several times. But, aside from the testimony it is difficult to believe that any of these men, experienced and competent as they evidently were, would not know that a thirty foot head of water in the well, connected at the bottom with the sewer, would cause the water to run back into the sewer.

Both appellants complain of the instruction of the court on the measure of damage. The evidence was that at the time the sewage was forced into the basement plaintiff had there about $16,000 worth of canned goods. The cans were labeled and packed in pasteboard cartons, stacked on the floor. Most of these goods had to be moved and the basement cleaned and the labor for this cost $95. No serious contention is made about this item. The cartons which came in actual contact with the sewage were ruined, the labels on the cans in them came off and the cans were disfigured and began to rust. The goods thus actually damaged were worth just before the injury $1,567.01. Immediately after the injury the goods were not salable at any price. By expending $425 for new labels and

cartons, including labor in repolishing the cans and relabeling and packing, the goods still had to be sold as damaged goods in such lots as they could be disposed of and at the best price that could be obtained when a purchaser could be found. So handled they were worth $783.50. The court instructed the jury as follows:

"If you find in favor of the plaintiff, the measure of its damages will be the difference, if any, by way of diminution, between the fair market value of the plaintiff's goods or stock affected by said flood of sewage, immediately before such flood, and the fair market value thereof immediately after such flood and after such goods or stock has been cleaned and relabeled, not exceeding $783.50 for such depreciation in value, and the reasonable and necessary expenditures made by the plaintiff in cleaning up its premises, removing therefrom the filth deposited therein by said flood, and in overhauling its stock of goods made necessary by such flood; not exceeding $520.00 for this item of damages; and the aggregate sum of your verdict cannot exceed $1,303.50."

This instruction gave a correct rule for measuring the damages in this case. When personal property is damaged by the negligence of another the rule for measuring the damages should be applied that will reimburse the owner for the actual loss sustained, without giving him double damage for any portion of the loss. The specific rule applied must depend upon the facts in the case. The rule more frequently given, because more often applicable, is the difference between its value immediately before and immediately after the injury. (17 C. J. 877; *Broadie v. Randall,* 114 Kan. 92, 216 Pac. 1103.) Where the damages can be entirely or partially repaired it is the duty of the owner to make such repairs and thus lessen his damage as much as possible (*Gilwee v. Pabst Brewing Co.,* 195 Mo. App. 487), and he is entitled to be reimbursed for the cost of such repairs. Where the repairs restore the property to as good condition as before the injury, the cost of such repairs is the measure of damage, provided they do not exceed the actual damage sustained. Where such repairs improve the condition of the property but do not restore it to its former value, the difference between the original value and the value after the repairs are made, plus the cost of the repairs, if this amount does not exceed the damage, is the measure of damages. This is the rule the court applied in this case and it is sustained by the following authorities: *Cook v. Packard Motor Car Co.,* 88 Conn. 590; *Latham v. C. C. C. & St. L. Ry. Co.,* 164 Ill. App. 559; *S. R. in Ky. v. Kentucky Grocery Co.,* 166 Ky. 94. In this last case it was said:

"Where an injury to personal property does not affect its destruction, that is, where it is susceptible of repair, the measure of damages is the difference

between the reasonable market value of the property immediately before the injury at the place thereof, and its reasonable market value immediately after the injury at the place thereof. Evidence of the reasonable value of such repairs made necessary by the injury, as were required to place the property in usable condition, as well as evidence of its reasonable market value when repaired, is competent as bearing on the reasonable market value of the machine immediately after the injury. But if the property should be rendered by reason of the repairs, more valuable than it was before the injury, then of course the full expenditure for the repairs should not be at the expense of the defendant. On the other hand, if by reason of the injury the property has been rendered incapable of being made, by repairing it, as valuable as it was immediately before the injury, the plaintiff should not be required to lose this deterioration." (p. 96.)

In *Monroe v. Lattin,* 25 Kan. 351, it was said:

"An instruction that the damage to the buggy and harness would be the difference in the value of the property before the injury and after the repairs, with the reasonable cost of the repairs, and value of use during repairs, provided the damage did not exceed the value of the property, lays down a fair mode of measuring the damages." (Syl. ¶ 4.)

In *Broadie v. Randall,* 114 Kan. 92, 94, 216 Pac. 1103, it was said:

"In cases where the repair of an injury did not restore the property to its original condition and value, but was a reasonable effort to make it as nearly usable as practicable, and as repaired was not as valuable as it was before the injury, the cost of the repair together with the difference in value of the repaired property and its value before injury might in some cases be a fair measure of the loss sustained."

See, also, *Kerns v. Kansas City,* 79 Kan. 562, 100 Pac. 624; *McCullough v. Hayde,* 82 Kan. 734, 109 Pac. 176; *Meyer v. Rosedale,* 84 Kan. 302, 113 Pac. 1043.

The city contends there is a duplication in the allowance of the $95 item. We have carefully examined the evidence and findings and this contention is not well founded. Complaint is made of an order of the court permitting an amendment to the petition to conform to the evidence. This is a matter addressed to the sound discretion of the court and appears to have been justified.

Finding no error in the case, the judgment is affirmed.