No. 25,476.

MICHAEL F. GORMAN, *Appellant*, v. CITY OF ROSEDALE and THE
CITY OF KANSAS CITY, *Appellees*.

SYLLABUS BY THE COURT.

MUNICIPAL CORPORATIONS — *Public Improvements — Attractive Nuisances—
Governmental Powers—Liability for Injuries*. The city of Rosedale de-
termined that the conservation of life, health and property within the munic-
ipality would be promoted by straightening the devious channel of a
creek which meandered through the town and back and forth into and
out of the neighboring town of Kansas City, Mo. Accordingly under
authority of statute, it constructed an artificial channel and tunnel through
a hill to lead the stream by a short course directly into the Kansas river.
Prior to this diversion and improvement, in times of heavy rain the creek
was wont to inundate parts of the city and cause destruction to life and
property, and in times of dry weather foul and disease-breeding pools
existed along its course. The artificial channel and tunnel were designed
to correct the evil tendencies of the stream, and a complementary sewer
project was constructed to eliminate the stagnant pools. Plaintiff's sixteen-
year-old son was drowned in the artificial channel and tunnel while wad-
ing and fishing therein with other boys. In an action by the father to
subject the city to liability for the death of his son, it was properly held
that the artificial channel and tunnel were not an attractive nuisance, and
that they were constructed and maintained by the city in its govern-
mental capacity; and the ordinary rule was properly applied that in the
absence of statute no liability can be imposed on a city for negligence in
the construction and maintenance of public improvements made by the
city to conserve life, health and property within the municipality.

Appeal from Wyandotte district court, division No. 1; EDWARD L. FISCHER,
judge. Opinion filed March 7, 1925. Affirmed.

*J. H. Brady*, and *T. F. Railsback*, both of Kansas City, for the appellant.
*H. J. Smith*, *William Drennan*, *W. M. Benton*, and *Joseph A. Lynch*, all
of Kansas City, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: This was an action by a father for the death of his
sixteen-year-old son, who was drowned at the entrance of an artificial
tunnel which the city of Rosedale had bored through a hill for an
outlet to the Kansas river to divert the water of a creek which
theretofore had meandered back and forth through parts of Rosedale,
Kan., and Kansas City, Mo., and which in wet weather was wont
to subject parts of those cities to inundation and damage to life and

property. In dry weather the creek was sluggish, serving as an open sewer for the two cities, and containing foul and stagnant pools which were inimical to public health.

The project of correcting the mischievous tendencies of the stream, known as Turkey creek, had been the subject of various ordinances and official negotiations between Rosedale and Kansas City, Mo., and eventually resulted in straightening and widening the channel in Rosedale, and in making a tunnel through "Greystone Heights" and damming the old channel leading into Missouri, thus directing the creek by a short cut into the Kansas river. A complementary part of this project was the construction of a sewer which drained the stagnant pools which had formerly existed in the old channel during seasons of little rainfall.

The entrance to the tunnel is approached by an artificial channel with high banks from the point where the stream was dammed and diverted from flowing into Missouri. The artificial channel has a bed 30 feet wide, paved with concrete, and the banks are similarly faced with concrete for some 300 feet from the tunnel entrance. A witness for plaintiff who viewed the situation the day of the accident testified:

"There was a concrete facing on either side of the creek. I was over there the same day and went into the water. I entered the water about 400 feet from the tunnel entrance; . . . I walked . . . to the tunnel; . . . For the first 300 feet the water ran in the path of the creek from about 4 inches up to 2 feet; it was flowing very fast right at the mouth of the tunnel. Where I first entered the water it was nearly dry and for the first 100 feet was only about 6 inches deep and was not very swift; the second 100 feet was probably a foot deep, and as we neared the tunnel it had a riffle or current. I walked in the water until within about 50 feet of the tunnel. At that time it was about 1½ feet deep. At the 50 feet immediately before my entering the tunnel the water was swift and looked to be about 2 feet deep; right up to the mouth of the tunnel it was 15 feet or probably more deeper. . . . As I got into the tunnel proper it dropped about 15 feet; going back 15 or 20 feet from the mouth of the tunnel there was a swift current. The bed of the artificial creek had a slope and had been built in that shape and it was slippery; until you got within about 50 feet of the tunnel the bed of the creek was flat, but there was a down grade toward the tunnel, sloping gradually downward until right at the tunnel."

A civil engineer testified that the abrupt pitch into the tunnel entrance was to give the waters of the creek such velocity that debris would not accumulate and choke the tunnel, but insure its being carried through into the river.

On June 10, 1921, five or six boys went to Turkey creek, entering the stream bed near where the natural channel runs into the artificial channel some three or four hundred feet from the tunnel entrance. They waded towards the tunnel. Three of the lads slipped into the deep water and managed to climb out again, but two were drowned.

One boy of eleven years testified:

"It was afternoon when we started over there. Paul Wise, my brother Franklin Cooper, William Gorman and myself and two more boys were together. . . . I had never been over to this creek before, but I think the other boys had been over there. We . . . went over the hill and down a path. We went down into the creek from the west side about 300 feet back from the mouth of the tunnel and fished for crawdads. We could see into the tunnel quite a ways, but not clear through, because it was dark in there. We were all barefooted; nobody went in swimming; we did not go inside the tunnel. My brother was going west and had hold of my hand; we slipped and fell into the water, but I grabbed hold of something on the bank; my brother didn't get hold of that and the Gorman boy reached in and tried to get him and he slipped and went in too."

The father of the Gorman lad brought this action against the city of Rosedale, and its successor, Kansas City, Kan., charging negligence in the construction and maintenance of the artificial channel and tunnel, and alleging that it was an attractive nuisance to children. Plaintiff's petition alleged:

"The defendant was negligent in the matters herein set out, in altering said watercourse; in constructing said artificial channel; in constructing said tunnel through said bluffs; in diverting the water from said natural watercourse through said channel and tunnel; in constructing said tunnel in such a way as to cause the water in said stream to flow into said tunnel with a swift current; in constructing said tunnel narrow, so as to increase the rate of flow of said stream as it enters the tunnel; in failing to provide any barriers around said artificial channel; in failing to provide any barrier across the mouth of said tunnel; in failing to post any notices or warning of the dangers lurking in the water of said creek at said place; in failing to guard said dangerous channel and watercourse; in permitting said channel, watercourse and tunnel to exist in an unguarded and dangerous condition attractive to children within the limits of said city; in failing to use reasonable care to keep the plaintiff's child and his playmates away from said watercourse, channel and tunnel; in maintaining in said city said dangerous and attractive nuisance. . . . In so constructing the tunnel and its approaches so there would be a dangerous but unseen stepoff in the hole in the bed of said channel and tunnel—an eddy, whirlpool and undertow in the water flow into said tunnel, and a deep and dangerous hole therein."

The evidence for plaintiff tended to show the historical facts pertaining to the construction of the tunnel and the death of plaintiff's

son as alleged. The evidence did not show that it would have been practicable to have inclosed the artificial channel and tunnel so that boys might be kept out. A civil engineer called as a witness for plaintiff testified on cross-examination:

"The city would have to put a wall around the bed of Turkey creek to keep the boys away the full length of the creek. And even if they did that, there was nothing to prevent their coming off the public highway into the creek. It would not be practical to put anything across the mouth of the tunnel to keep the boys or other trespassers from getting in there. It would be likely to choke up the flow of the water."

Nor was there any evidence to show that there were any faults in the engineering or construction of the tunnel. As a part of the history of the tunnel and the objects sought to be accomplished certain ordinances and contracts between Rosedale and Kansas City were brought into the record. One of these took note of the public character of the improvements and the necessity therefor, thus:

"Whereas, Turkey creek, a natural watercourse, runs through the City of Rosedale and into and through west bottoms in Kansas City, Mo., finally emptying into the Kaw river in Kansas City, Kan.; that said creek is now used as an open storm and sanitary sewer by all three cities at the points therein through which it runs; that said creek as now so used is unsanitary and offensive to the inhabitants of such cities; that the watersheds of said creek are partly in Missouri and partly in Kansas, and within said cities, and the health, safety and comfort of the inhabitants thereof requires the construction of certain inclosed storm and sanitary sewers to take care of the water and sewage of Turkey creek from Rosedale, Kan., to its mouth where it empties into the Kaw river; that in order to successfully accomplish this undertaking, and to take care of the flood water in Turkey creek above Valley street in Rosedale, and to prevent such water and the sewage below Valley street from flowing down said creek and through that portion of Rosedale below Valley street, and thus protect the property and health and secure the safety and comfort of the inhabitants of Rosedale and Kansas City, Mo., it is necessary to alter and change the channel and divert the course of Turkey creek in Rosedale to a point west of Valley street to the northward, through a ditch, drain or tunnel into the Kaw river; and that the changing and diverting of Turkey creek as aforesaid will be for the mutual benefit of both Rosedale and its inhabitants and Kansas City, Mo., and its inhabitants; that in order to change and divert the course of Turkey creek as aforesaid it will be necessary to build, construct and maintain a dam across the same at a point above mentioned, and to raise the grade of Valley street from the bluff on the north to a point about 200 feet south of Turkey creek."

Defendant's demurrer to plaintiff's evidence was sustained, and he appeals.

It seems rather obvious that the trial court's ruling was based

on the theory that the artificial channel and tunnel were not an attractive nuisance, and also, perhaps, on the theory that they constituted an improvement made by the city in its governmental capacity, as to which, even if negligently constructed or maintained, no liability would attach because there is no statute imposing such liability.

It is not contended that the city lacked authority to build the tunnel. It was apparently constructed under section 1735 of the General Statutes of 1915, which in part reads:

"The council [of a city of the second class like Rosedale] may . . . establish, alter, change, straighten, divert and otherwise improve the channels of watercourses, wall them and cover them over, and in connection therewith construct and maintain within or outside of the city limits such channels, tunnels and ditches as may be required and necessary to form an outlet and drain for the water carried by such watercourses into a creek, ravine or river, and build and erect all walls, embankments, levees and rip-raps to protect the banks thereof; . . . *And provided further,* That in the construction and maintenance of such work and improvement such city may receive aid and contributions towards the payment of the cost thereof from, and may contract and coöperate with municipal and other corporations and individuals of this or any other state. . . . *The mayor and council shall be the sole judges of the necessity for and the expediency of the making of the improvements herein provided* for and the manner of the payment of the cost thereof; and this act shall be liberally construed to encourage the improvement of natural watercourses, to protect lands from damage and from injury by overflow, and to promote the public health, convenience and welfare."

The determination of the city government that the construction of the diversion channel and tunnel was for the public welfare, being within the scope of its official powers, was conclusive. In *The State, ex rel., v. Dowling et al.,* 117 Kan. 493, 496, 232 Pac. 615, it was said:

"This court has repeatedly held that where the determination of the existence of prerequisite facts to authorize official action is vested in a local tribunal, such as a county board or a mayor and city council, its determination is conclusive and is not subject to review except in cases of fraud or similar misconduct of sufficient gravity to vitiate it." (Citing authorities.)

It seems perfectly clear, too, from a judicial standpoint, that straightening the meandering course of a creek flowing through a city and making an artificial channel and tunnel to lead it by a short route to the river would have the tendency to minimize the evil effect of floods on life and property in its vicinity. And the

elimination of foul and stagnant pools in the creek bed in times of drought was also an important desideratum from the standpoint of public health. We think that this undertaking was governmental in character, and therefore the city was not liable for negligence in the construction or maintenance of the improvement even if negligence had been established. This nonliability of cities for the manner in which their governmental powers are exercised and governmental duties discharged, where no statute imposes a liability, has been so frequently and fully discussed elsewhere that it needs no amplification here. In *Rose v. City of Gypsum,* 104 Kan. 412, 179 Pac. 348, it was said:

"Thus it has been held that a city is not liable for damages caused by an explosion of dynamite caps which the city's employees. had carelessly left on the premises of its detention hospital (*Frost v. City of Topeka,* 103 Kan. 197, 173 Pac. 293); nor where a child had been bitten by a wolf in an unguarded cage of a city zoölogical garden (*Hibbard v. City of Wichita,* 98 Kan. 498, 159 Pac. 399); nor where a boy was drowned in an unguarded city park (*Harper v. City of Topeka,* 92 Kan. 11, 139 Pac. 1018); nor because of injuries sustained through defective conditions and negligence in the maintenance of city jails and pest houses (*LaClef v. City of Concordia,* 41 Kan. 323, 21 Pac. 272; *Butler v. Kansas City,* 97 Kan. 239, 155 Pac. 12). Illustrations of this sort could be multiplied from references to our own reports without the need of borrowing citations from other jurisdictions." (p. 419. See, also, *Todd v. Drainage District,* 109 Kan. 754, 201 Pac. 1096.)

In view of these controlling precedents and the reasons on which they are founded, it might seem unnecessary to consider whether the artificial channel and tunnel could be denounced as an attractive nuisance. But as appellant asserts that the decision was based on the trial court's theory that no attractive nuisance was shown, the point may be examined. First, however, it should be noted that a judgment correct in itself cannot be disturbed merely because the reasons given therefor or which led to such judicial determination are fallacious or illogical. (*Fitzgerald v. Realty Co.,* 106 Kan. 54, 56, 186 Pac. 739; *Harmon v. Harmon,* 111 Kan. 786, 793, 208 Pac. 647; *The State v. Frey,* 111 Kan. 798, 802, 208 Pac. 574.) And even in our own premier "attractive nuisance" cases, a prerequisite to a recovery for damages was at least some evidential showing that it was practicable to keep children away from such dangerous allurements, or to lock, inclose, or otherwise secure them so that they would not work mischief to children. (*K. C. Rly. Co. v. Fitzsimmons,* 22 Kan. 686; *Price v. Water Co.,* 58 Kan. 551, 50

Pac. 450; *Biggs v. Wire Co.*, 60 Kan. 217, 56 Pac. 4; *Electric Light Co. v. Healy*, 65 Kan. 798, 70 Pac. 884; *Osborne v. Railway Co.*, 86 Kan. 440, 121 Pac. 364. See, also, excerpt from *Peters v. Bowman*, quoted in *Zagar v. Railroad Co.*, 113 Kan. 240, 243, 214 Pac. 107.) The evidence in this case was that it was altogether impracticable to keep children out of the artificial channel and tunnel of Turkey creek; and, for that matter, there was no evidence which would justify a conclusion that there were any hazards to boys wading in the artificial channel and tunnel different or greater than those which exist in natural streams or in this stream prior to the diversion and improvement of its watercourse. In *Somerfield v. Power Co.*, 93 Kan. 762, 145 Pac. 893, the action was for damages for the death of a child who had fallen into an artificial canal which had been constructed by a power company through a city for commercial purposes. The liability of the power company turned on the question whether the open, unfenced and unguarded canal, fifty feet wide, with perpendicular banks thirteen feet high, carrying a stream of water seven feet deep through a populous city, and along the banks of which children were wont to gather to play and fish and swim, was an attractive nuisance. The trial court so held. In reversing that judgment this court said:

"The canal, as will be observed, has the characteristics of a natural stream and can no more be regarded as an attractive nuisance than would a river flowing through the city or a pond or lake therein. It has been held that an unprotected pool in a natural watercourse to which boys resorted to wade and swim could not be regarded as an attractive nuisance within the meaning of the 'turntable' cases. (*Tavis v. Kansas City*, 89 Kan. 547, 132 Pac. 185.) In *Harper v. City of Topeka*, 92 Kan. 11, 139 Pac. 1018, it was ruled that a pond in a city park which was substantially a reproduction of a natural pond, although attractive to children, did not come within the rule of attractive nuisances. There is no greater necessity to build a fence or put a cover over the canal than there would be to fence or cover a natural stream, and there can be little distinction made between them so far as the 'turntable' doctrine is concerned. . . . The court does not feel warranted in extending the doctrine so as to make appellant liable for failing to fence or guard a watercourse like the one in question, and which, so far as the 'turntable' rule is concerned, corresponds with a natural stream." (p. 764. See, also, *Zagar v. Railroad Co.*, 113 Kan. 240, 214 Pac. 107.)

The case of *Roman v. City of Leavenworth*, 90 Kan. 379, 133 Pac. 551; *id.* 95 Kan. 513, 148 Pac. 746, is urged on our attention as supporting the contention of plaintiff. Measurably so it does. At the first presentation of that case in this court the law of the

case, rightly or wrongly, was settled (*Gratney v. Wyandotte County*, post, p. 101), and an affirmance of the judgment at the second hearing, after a jury had settled the facts, followed as a matter of course. In that case a boy was burned by going into a smoldering city dump and the city was held liable; but the question whether the dump was maintained by the municipality in its governmental capacity or in its *quasi*-private proprietary capacity was not raised and was not decided.

The judgment of the trial court was correct, and it is affirmed.