No. 28,414.

Donald Eugene Bruce, a Minor, by Albert Bruce, His Father and Next Friend, *Appellee*, v. The City of Kansas City, *Appellant*.

(276 Pac. 284.)

Opinion filed April 6, 1929.

*L. S. Harvey, Clyde C. Glandon* and *John C. O'Brien*, all of Kansas City, for the appellant.

*David F. Carson* and *Carl W. Fincke*, both of Kansas City, for the appellee.

The opinion of the court was delivered by

Dawson, J.: This was an action for damages on behalf of a child who was severely burned by falling into a pile of hot ashes on the municipal dump of Kansas City.

The pertinent facts were these: Along the right bank of the Missouri river at some distance northwest of its junction with the Kaw there is a tract of land belonging to the city which was dedicated by the founders of the town as a public levee for river traffic. (*Kansas City v. Wyandotte County*, 117 Kan. 141, 230 Pac. 67.) In an out-of-the-way place near the river on this unused levee, across some intervening railway tracks which skirt the edge of town, where its presence cannot annoy or offend the townspeople, the city

maintains a municipal dumping ground of some four or five acres, the use of which is regulated by city ordinances. The public is given the right free of charge to deposit on this dump any sort of rubbish, waste and discarded materials except garbage and stuff likely to become noxious to public health. The city keeps an employee at the dump on week days, whose business it is to show people where to unload their rubbish, and it is his duty to burn whatever is combustible and to keep the premises as sightly as its nature will permit. Among the many users of the dump to get rid of waste materials were certain milling companies, and two days before the accident giving rise to this lawsuit one of these companies brought four loads of grain dust to the dump. The city's employee, known as the dump master, set fire to the dust on a Friday afternoon and it burned that day and Saturday. The dump master was on the premises until about 2:30 o'clock on Sunday afternoon. While such stuff had been known to smolder for several days, in this instance there was no smoke after the first day and the fire had transformed the pile of grain dust into whitened embers resembling "sand" according to plaintiff's petition, "a pile of brown stuff the color of the dust in the road" according to one witness, "a pile of gray, dusty brown-white ashes" according to another.

In a distant part of the city there resided one Albert Bruce with his wife and three small sons, the youngest of whom was this plaintiff, a child of five years. The father, Albert, was desirous of procuring a top for his automobile, and a friend told him he had gotten such a top at the city dump, so on the Sunday afternoon following the burning of the grain dust Albert and his family drove to the vicinity of the dump, parked their car and strolled along the edge of the dump. As Albert, the father, and his wife, who was leading this plaintiff by the hand, walked along by the edge of the dump the two older boys dropped behind to play in this pile of ashes. Their little brother, plaintiff herein, desired his mother to release him, which she did, and he stumbled and fell into the hot ashes. The mother testified:

"I was about eight or ten feet from the boys when I heard the scream; I had been leading the little boy and he wanted loose so I decided to let him go."

The plaintiff's brother testified:

"Saw the place where my brother got into and got burned; it was like a pile of dust; we boys stopped near the place; we were going to play in it; my little brother stumbled and fell into the fire, there was no smoke coming out of the fire. . . ."

"I think my brother stumbled over a rock or a wire and when he went down he got up and got out and screamed and my father ran after him. He got out of the fire before my father came."

The father testified:

"I drove down Minnesota avenue to Third street, on east and across the railroad track and then I followed a road in northeasterly direction; the road was plain enough, although it was not what you would call a right smooth road; it was just a general road that the wagons would go in to the dump. The country down there is what you might say rough; when I got to the dump I stopped and I and my family got out; my three little boys were along. The boys were right along with us for a little ways, then they dropped behind; my wife and I went ahead. My attention was first attracted when I heard one of them scream; I turned around and saw this boy was in a pile of what proved to be fire; it just appeared to be a pile of brown stuff that looks as much like the dust in the road, the color of the dust in the road; I had just glanced at it in passing, I noticed a pile of stuff there; I did not notice anything there that indicated that it had fire in it; there was no guard or railing or anything around it to keep people from going around that or up to it, and there was nobody around there that said anything to me about going near that or keeping away from it or giving me any warning of any kind; there was no one came up there after the boy got into it; I did not see a soul around there in that particular neighborhood. I observed it more closely when I went back to the boy. I should judge that it was at least four and a half or five feet across it at the ground level, and appeared to be about two and a half feet in the center; it seemed to be dumped in a hole on one side; on the side where the road was it was only just a very little below the level of the road and on the other side there was quite a hole there; when I got back where the boy was he was standing in this brown substance that looked like road dust. The ashes, I suppose you would call them, were up something about half way between his feet and his knees; he was on his feet when I got back to him; his face and his hands were covered with what I supposed to be ashes. The weather was warm and he was barefooted. I don't know how the boy got in there or why he got in or anything of that kind; when I got to him I took him up in my arms; when I heard him scream I was possibly ten feet ahead of him; he was burned on the feet and legs, arms and hands. . . .

"Cross-examination:

"We got down to the city public dump something between four and five o'clock; I had never been there before. It is quite a little ways from Third and Minnesota over to where the dump was at that time. I would judge something like two blocks to the edge of the dump. . . . I left the car on the west side of the dump and I and my family went along the road across the dump. I noticed the hole there that the boy got into as I walked by; it was the only pile of stuff that looked like that; there were other piles of stuff there but not the same color; a pile about two and a half feet high and four and a half or something like that through."

Plaintiff's petition narrated the facts of the injury and alleged:

"That said place where said plaintiff fell into said burning refuse was apparently cold, charred and whitened embers only remained therein. That it was attractive to children and a place to play and naturally attracted the plaintiff to the place where the same was burned. . . .

"That said defendants carelessly and negligently failed and neglected to keep a watchman at said point where said refuse was burned close enough to warn plaintiff and other persons of his age from the dangers incident thereto, and from being around or about such places, and carelessly and negligently failed and neglected to in any manner guard said burning refuse at the place where plaintiff was burned . . . and carelessly and negligently failed and neglected to in any manner warn plaintiff of any danger . . . and carelessly and negligently failed and neglected to burn said grain dust and refuse in a reasonably safe place and in a reasonably safe manner and away from the likelihood of children of the age of plaintiff to come or to pass or to play."

Defendant joined issues on these allegations and the cause was tried before a jury which returned a verdict of $5,000 against the city, and judgment was entered accordingly.

The city assigns error in overruling defendant's motion for judgment on plaintiff's petition and opening statement, and on overruling its demurrer to the evidence and on the general tenor of the court's instructions, but centers its principal argument on the broad proposition that a municipal corporation is not liable in damages for injuries sustained by children on a free public dump maintained by it for the convenience of its inhabitants.

Counsel for the appellee do not contend that the maintenance of the dump was not an exercise of the city's governmental functions (although there are respectable authorities to that effect), nor do they seriously challenge the settled rule of law in this jurisdiction that for negligence in the discharge of its governmental functions a municipality cannot be subjected to damages except where some pertinent statute so declares. The familiar instance of the statutory liability of cities for negligence in the exercise of their governmental duties is the mob statute (R. S. 12-201, 12-202), and the typical exception to such general rule of nonliability in the absence of statute is that of injury to person or property caused by defective streets or sidewalks. (*Rogers v. City of Coffeyville*, 95 Kan. 171, 147 Pac. 816; *King v. City of Parsons*, 95 Kan. 654, 149 Pac. 699; *Clark v. City of Hutchinson*, 114 Kan. 172, 217 Pac. 305; *Dalke v. City of Inman*, 122 Kan. 728, 253 Pac. 240.) See, also, citations

and instances of both liability and nonliability of cities for negligence in *Rose v. City of Gypsum,* 104 Kan. 412, 419, 420, 179 Pac. 348. Later instructive cases touching the nonliability of cities for negligence in the exercise of their governmental functions are *Gilliland v. City of Topeka,* 124 Kan. 726, 262 Pac. 493; *Warren v. City of Topeka,* 125 Kan. 524, 265 Pac. 78; and *Foster v. Capital Gas & Electric Co.,* 125 Kan. 574, 265 Pac. 81. In the Foster case just cited the trial court held the city liable for negligence in various respects, but particularly in the careless manner in which it had left the soil around a sewer which it had constructed. The soil was left loose and untamped. A gas main was laid above the sewer. When the rains came the loose soil about the sewer washed away, leaving the gas main without support. In consequence it broke; the gas escaped into a house and blew it up and wrought terrific damage to persons and property near by. On appeal the city invoked the rule of nonliability for negligence in the discharge of its governmental functions and that the construction and maintenance of a sewer was of that character. This court held:

"The construction and maintenance of a sewer ordinarily is a gevernmental function as distinguished from ministerial or proprietary." (*Foster v. Capital Gas and Electric Co.,* supra, syl. ¶ 4.)

In the opinion it was said:

"What is here said with reference to liability of the gas company does not apply to the defendant city. In our opinion the city is not liable because the injury was too remote and because the city was engaged in a governmental function. The general rule is that municipal corporations are not liable in damages for negligence of their officers in the discharge of their duties when engaged in governmental functions, unless the liability is expressly imposed by law. (*Harper v. City of Topeka,* 92 Kan. 11, 139 Pac. 1018.) There have been cases before this court in which the municipality was held liable for negligence in carrying out, constructing, or maintaining municipal improvements. (*Kansas City v. Slangstrom,* 53 Kan. 431, 36 Pac. 706; *King v. City of Kansas City,* 58 Kan. 334, 49 Pac. 88; *Wholesale Grocery Co. v. Kansas City et al.,* 115 Kan. 589, 224 Pac. 47.) In the King case it was said:

" 'In such cases, however, if through any negligence in carrying out the plan or in constructing or maintaining the sewers, the property of a private owner is injured, a liability will arise.' (Syl. ¶ 2.)

"It will be noted, however, that the court in deciding those cases, did not consider or pass upon the question as to whether or not the city was engaged in a governmental function. . . . In the instant case it is argued that the construction of a sewer is a ministerial and not a governmental function, and that the city is liable for any tort committed in the performance of a minis-

terial function. We think not. The construction and maintenance of a sewer, in our opinion, is governmental as distinguished from ministerial or proprietary. . . . We are not unmindful of a contrary view held in *Lockwood v. Dover,* 73 N. H. 209, where the question is well discussed, but think the rule above announced, that the construction of a sewer is a governmental function, is the better rule, and therefore the city is not liable." (pp. 578, 580.)

A critical examination of some of our cases where cities have been held liable for negligence will show that however stoutly the city's liability was resisted on miscellaneous grounds no defense whatever was made on the broad ground of its nonliability for negligence in the discharge of its governmental functions. This fact was remarked in *Gorman v. City of Rosedale,* 118 Kan. 20, 234 Pac. 53, where damages were demanded based on the city's negligence causing the death of a boy in an artificial channel and tunnel for a turbulent and noxious stream. It was there said:

"The case of *Roman v. City of Leavenworth,* 90 Kan. 379, 133 Pac. 551; Id., 95 Kan. 513, 148 Pac. 746, is urged on our attention as supporting the contention of plaintiff. Measurably so it does. At the first presentation of that case in this court the law of the case, rightly or wrongly, was settled (*Gratney v. Wyandotte County,* post, p. 101) and an affirmance of the judgment at the second hearing, after a jury had settled the facts, followed as a matter of course. In that case a boy was burned by going into a smoldering city dump and the city was held liable; but the question whether the dump was maintained by the municipality in its governmental capacity or in its quasi-private proprietary capacity was not raised and was not decided." (p. 26.)

In support of the judgment in this case, however, appellee urges the point that although a city may not be liable in damages occasioned by the negligent manner in which its governmental functions are performed that immunity does not extend so far as to relieve the city where the damage or injury is caused by a nuisance created and maintained by the municipality. There is good authority to that effect. Perhaps the defective street and defective sidewalk cases cited above belong, in principle, in that category. Another example is that of *Malchow v. City of Leoti,* 95 Kan. 787, 149 Pac. 687, L. R. A. 1915F, 568, where a recovery was allowed against a city for injuries sustained by a plaintiff by the bursting of the oil glass of an engine which was furnishing the motive power for a merry-go-round which the city authorities had permitted to be set up and operated in a public street. One can hardly quarrel with the court's pronouncement in that case that a merry-go-round in a city street with its attendant guy ropes, cable, engine, tank and fuel is a nuisance, and liability could be based on the city's breach of duty to

keep its streets safe for public travel—although the decision may be open to criticism that the causal connection between such delinquency on the part of the city and the plaintiff's injuries was too remote. Another familiar case where the city was penalized on the nuisance theory of municipal liability was that of *Kansas City v. Siese,* 71 Kan. 283, 80 Pac. 626, where a boy was drowned in a pond casually created by the construction of a fill across a ravine to bring a street to the proper grade. The fill or embankment formed a dam where water accumulated and a sewer flume was laid on piles over the surface of the pond. Boys were wont to frequent the pond to fish and swim. The sewer pipe served as a footway from which to spring or dive into the pond; and one lad who couldn't swim walked out along the sewer pipe, jumped in and was drowned. This court held that the city was liable under the rule of the "turntable cases." In *Harper v. City of Topeka,* 92 Kan. 11, 14, 139 Pac. 1014, the Siese case was noted as an exception to the rule of nonliability of cities, but an extra and belated prop was put under its dubious soundness by an intimation that it might have been partly justified on the ground that this particular nuisance was *"in or adjacent to a street* in a thickly settled district of the city." In the Harper case itself the pond was in a city park adjacent to streets in a thickly settled district of the city, and the pond itself had intentionally been made as "attractive" to children as practicable, and vastly more "attractive" than the pond in the Siese case in Kansas City; but the real ground for the decision in the Harper case, as in the later Gilliland and Warren cases, *supra,* was that the bench and bar of this and other states were gradually coming out from under the spell of the early "turntable cases." (*Railroad Company v. Stout,* 84 U. S. 657, 21 L. Ed. 745; *K. C. Rly. Co. v. Fitzsimmons,* 22 Kan. 686; and note in 14 L. R. A. 781 *et seq.*) Bench and bar have gradually come to realize that the "attractive nuisance" doctrine founded on the "turntable cases" had been carried altogether too far in succeeding decisions. Moreover, in the Siese case, too, no point was made touching the rule of the city's nonliability for negligence in the discharge of its governmental duties—a rule of law which probably was not so familiar to the bench and bar as it is now. Although the pertinence of this rule in the Siese case is obvious, it was apparently not urged nor considered, so the decision quite naturally went off on the point that no essential difference could be discerned between it and *Price v. Water Co.,* 58 Kan. 551, 50 Pac. 450, where the defend-

ant was a private corporation having no immunity for negligence on the part of its officers or employees. So, too, in *Wholesale Grocery Co. v. Kansas City et al.*, 115 Kan. 589, 224 Pac. 47, no claim of immunity as a governmental agency was entered by the city, and that point was neither decided nor considered.

So far we have been examining the soundness of the rule urged by appellee that the city is liable in damages for the maintenance of an "attractive nuisance" as an exception to its general nonliability for negligence in the performance of its governmental functions. This court candidly recognizes the fact that all the cases where liability of the city has been sanctioned and where it has been denied cannot be harmonized; but it is our constant purpose to preserve their consistency as far as possible; and where not possible to search anew for a logical principle which should control in their determination. It is this latter alternative which must be applied to the present case. We are not satisfied to say that the municipal dump in Kansas City is an attractive nuisance because the pond in the Siese case, or the city dump in the Roman case, was so declared; and we are not now prepared to admit that the Kansas City municipal dump was a nuisance of any sort. Its maintenance was both a convenience and a necessity—as much so as a pesthouse (*Butler v. Kansas City*, 97 Kan. 239, 155 Pac. 12), and it was kept in as shipshape fashion as a public dump could be. Its location was off the path of street traffic, and it was not shown that it could be fenced or barricaded so that small boys would not come on to it. Touching the failure of the city to have a caretaker constantly on guard to keep little boys from playing on the dump, it is difficult to see what a city caretaker could have done that the parents themselves could not do equally well or better. Be that as it may, and notwithstanding many authorities to the contrary, we find ourselves in good company when we·hold squarely, as we feel compelled to do, that in the maintenance of a free municipal dump where the public were privileged to dispose of waste materials and miscellaneous rubbish and in the burning of such rubbish as was combustible the city was exercising a governmental function, and that the dump was not a nuisance *per se*, nor was the city liable in damages to plaintiff who was permitted by his parents to go on the dump to play and who tripped and fell upon a pile of hot ashes and was injured thereby. To this effect are: *Savannah v. Waters*,

33 Ga. App. 234, L. R. A. 1915C, 741; *Montain v. Fargo*, 38 N. D. 432, L. R. A. 1918C, 600; *Moulton v. Fargo*, 39 N. D. 502; *Haley v. Boston*, 191 Mass. 291, 5 L. R. A., n. s., 1005 and note; *Scibilia v. Philadelphia*, 279 Pa. St. 549, 32 A. L. R. 981 and note; 19 R. C. L. 1128. Among many cases to the contrary, which we have patiently perused and found worthy of note are: *City of Denver v. Davis*, 37 Colo. 370, 6 L. R. A., n. s., 1013, 119 A. S. R. 293; *Pass Christian v. Fernandez*, 100 Miss. 76, 39 L. R. A., n. s., 649; *City of Nashville v. Mason*, 137 Tenn. 169, L. R. A. 1917D, 914. We get still another slant on this general subject in *City of Selma v. Jones*, 202 Ala. 82, L. R. A. 1918F, 1020, where it was held that a municipal dump may be abated as a private nuisance to an individual owner of adjoining property if the owner is peculiarly annoyed thereby. The case of *City of Denver v. Porter*, 126 Fed. 288, is also to the contrary, but it was governed by a rule of Colorado law which the federal court was bound to follow and which made the control of a public dump a matter of local corporate concern rather than a detail of the governmental function of caring for the public health, sanitation and general welfare.

In 6 McQuillin Municipal Corporations (2d ed.) 806 it is said:

"In the cleaning of streets, the collection of garbage, and the establishment and maintenance of dumping grounds and incinerators, while diversity of judicial views still prevails, late cases generally hold, with some exceptions, that such functions are governmental, rather than proprietary, exercised by the municipality as an administrative agency of the state or for the public in the interest of the public health and general welfare, and hence, negligence relating thereto creates no municipal liability, unless in the exercise of such power a nuisance in fact is thereby created and maintained by the municipality."

See, also, White's Negligence of Municipal Corporations, § 24.

The other objections to the judgment need no consideration. The judgment is reversed and the cause remanded with instructions to enter judgment in favor of defendant.

HARVEY, J., not sitting.