No. 38,820

H. George Perry and Lois E. Perry, *Appellants,* v. The City of Wichita, a Municipal Corporation, *Appellee.*

(255 P. 2d 667)

Opinion filed April 11, 1953.

*Morris H. Cundiff* and *Garner E. Shriver,* both of Wichita, argued the cause, and *Dale M. Bryant, John C. Frank,* and *Glenn J. Shanahan,* all of Wichita, were on the briefs for the appellants.

*Lawrence E. Curfman* and *Douglas E. Shay,* assistant city attorneys, argued the cause, and *Fred W. Aley,* city attorney, was with them on the briefs for the appellee.

The opinion of the court was delivered by

WEDELL, J.: This was an action by H. George Perry and his wife against the city of Wichita to recover damages to personal and real property caused by water which overflowed plaintiffs' property located outside the city.

Plaintiffs appeal from orders sustaining a demurrer to their evidence, the overruling of their motion for a new trial and from the judgment rendered against them. The real issue here is whether the first mentioned order constitutes reversible error.

The material portions of appellants' evidence, in substance, disclosed:

They purchased a home in 1944 located approximately three-fourths of a mile south of the extreme eastern portion of the city. A natural watercourse known as Dry Creek runs through the eastern part of the city, slightly in a southwesterly direction. It flows east and south of appellants' property. The bed of the stream is approximately 150 feet from their east property line and some 200 feet south of their nearest building. The primary bed of the stream is approximately twenty feet wide and its banks are six to eight feet high. Approximately twenty or thirty feet north of the principal bank there is a secondary bank and then a rise of about three or four feet to appellants' property line and from there a slight slope up to appellants' buildings. The contour lines lying south of Dry Creek in that area indicate a higher bank on the south side of the stream than on the north side. In times of overflow it is greater to the north or towards appellants' property. The term "flood plain" is a proper term to apply to that area on a small scale. The area on which appellants' house is located is relatively flat compared to other parts of the area.

The development of this eastern part of the city began about 1941 or 1942 but the particular building impetus began about 1945 and continued. Some seventy-five new plats have been approved and developed fully or partially in that part of the city and within the drainage area of Dry Creek. The drainage area embaces 2,701 acres. Dry Creek is about seven and one-fourth miles in length. It has a west and east branch in the north upper area. The branches join approximately midway in its course. The stream

then continues on past appellants' property which was located south of the city limits on July 31, 1950, the date of the damage, but is now located within the city.

The development of the Dry Creek drainage area has been a co-ordinating effort by the owners of subdivisions, the utility advisory committee, which is an advisory group to the city planning commission, the city manager, city engineer, city service director and other city officials. The city also supervised and controlled the zoning, building requirements and character of improvements constructed.

The subject of proper drainage of surface water entered prominently into the consideration and development of new city plats. Dry Creek is a natural watercourse. The southern half of Dry Creek has many curves below the junction of the two branches. Some changes were made therein, especially in the west branch, by the elimination of loops, widening the channel and cleaning out trees and debris in its bed. These changes naturally accelerated the flow of water. Some underground flumes or vessels constructed of cement were installed along parts of the west branch drainage area and in other parts, along the west branch, open box channels designed to pick up surface waters were built. All these changes were made with a definite plan of carrying water into this natural watercourse. Many miles of street pavement were built with curbing and guttering which accelerated the flow of water into Dry Creek. Some of the paved streets were used as a means of carrying surface water into Dry Creek. Some old culverts and other openings were adequate prior to the development of this part of the city but were wholly inadequate to handle the volume of water at the time of the damage to appellants' property on July 31, 1950. The improvements for handling surface water were made principally along the west branch before it joined the east branch. From the junction south to appellants' property the channel is in its natural state, with possibly one exception which was a minor change made by Sedgwick county. The direct length of the meandering part of the channel north of appellants' property is about 9,000 feet. The drainage basin or area in 1950 was substantially as nature made it. No substantial amount of water is now passing into the Dry Creek area from any other drainage basin.

We are told there was rainfall of more than one inch in this area of the city on July 30 and approximately three and one-half inches on July 31, 1950, in about four hours. The water first got

onto a part of appellants' ground in 1944. There was no overflow in 1945 but their strawberries were ruined in 1947. The water rose a little each year after 1947 but did not get into their home until July 31, 1950. In 1951 it was one inch higher than in 1950. There were rainfalls prior to 1950 which equaled or exceeded those of 1950 but the flooding was not nearly so severe in this general area as in 1950. There was a flooding in 1951 with a smaller rainfall than in 1950. Comparable rains have increased the flooding since the mentioned development in the Dry Creek area. The amount of water reaching the area of appellants' property is now between two and one-half to three times as great as that which reached it before this area of the city was developed in the manner indicated. Without the development and changes indicated appellants' property would not have been flooded with the rainfall that occurred in 1950. The city assumed no responsibility for handling the increased flow of water after it left the city.

Appellants' position is that in its natural state the surface water from the drainage area of Dry Creek would not have flooded their lands; the over-all development of this drainage area by means of buildings, paved streets, the construction of curbs and gutters, the fixing of grade lines, the installation of flumes or vessels to carry off water and the changes made in the natural watercourse within the city all combined to increase the volume of water and the rapidity of its flow into Dry Creek beyond its capacity; that the city was aware of that fact and made no effort to dispose of or control the water after it left the city with the result their property, being that of a lower riparian owner, was damaged.

Appellants assert if the district court had applied the established rule that on a demurrer to evidence all testimony favorable to them must be accepted as true and all unfavorable testimony, if any, must be disregarded, the demurrer would have been overruled. Appellants' statement of the rule is correct and this court will consider the evidence accordingly. The question here does not concern the correct statement of the rule but rather whether the rule was properly applied to the conceded facts under the law applicable to cases of this character.

One of appellants' contentions is the city in its development program was not exercising governmental but proprietary or municipal functions and, therefore, is liable for its alleged wrongful acts. In support of that contention they rely primarily on *Krantz v. City of Hutchinson, et al.*, 165 Kan. 449, 196 P. 2d 227, and on some cases

from foreign jurisdictions. Before considering our own cases it should be frankly conceded there is considerable divergence of opinion among courts and textwriters relative to whether certain activities of cities constitute governmental functions or functions interchangeably referred to as proprietary, corporate and municipal. Some difference of opinion also obtains concerning the liability of cities when exercising either function. It would constitute a futile effort to attempt to harmonize the decisions as different courts have reached contrary conclusions on the same or highly similar facts. We, therefore, shall first examine our own decisions.

In the Krantz case, *supra,* the city erected a dike more than five miles from the city to protect city property, its residential and business buildings from flood damage at a time when it had authority to do so only within a distance of *five miles from the city.* ( G. S. 1935, 12-635. ) The distance was later increased to ten miles. ( G. S. 1949, 12-635. ) The petition in the Krantz case alleged the unlawful diversion of the water from the city caused damage to plaintiff's property located outside the city and that such dike was the approximate and legal cause of the damage; that the city's streets, its buildings and the property of the residents of such city were benefited thereby at plaintiff's expense. The trial court sustained the city's demurrer to plaintiff's petition. This court reversed the ruling. We held the city was not engaged in the exercise of governmental but proprietary functions and further that the city could not accept the benefits of its *ultra vires* acts and assert them as a defense. Appellants lean heavily on certain statements contained in that opinion relative to what acts of a city are governmental and what functions are proprietary. Without presently pursuing that subject we pause to observe that in the Krantz case the city, in going beyond the five mile limit, acted without authority to exercise any functions. In that respect the Krantz case is wholly unlike the instant case and is not controlling. Furthermore, as will presently appear, the city in the instant case performed functions only within its boundaries and such as were expressly authorized by law.

That a city, the same as an individual, is liable in damages for its negligent or wrongful acts when performed in a proprietary capacity is firmly established. The general rule, however, in this state, is that a city is not liable for negligent acts of its officers or employees when acting in the performance of governmental functions, absent a statute expressly imposing liability. ( *Gorman v. City of Rosedale,* 118 Kan. 20, 234 Pac. 53; *Foster v. Capital Gas*

*and Electric Co.,* 125 Kan. 574, 265 Pac. 81; *Bruce v. Kansas City,* 128 Kan. 13, 276 Pac. 284; *Parker v. City of Wichita,* 150 Kan. 249, 92 P. 2d 86; *Krantz v. City of Hutchinson, et al.,* supra.) The rule is based on the doctrine that the state is not liable except as made so by statute and that municipalities, governmental subdivisions of the state, when acting in a governmental capacity are arms of the state.

Exceptions to the general rule have been recognized where the city's conduct results in creating or maintaining a nuisance. Some of our cases are *Price v. Water Co.,* 58 Kan. 551, 50 Pac. 450; *Kansas City v. Siese,* 71 Kan. 283, 80 Pac. 626; *Roman v. City of Leavenworth,* 90 Kan. 379, 133 Pac. 551; *Foster v. Capital Gas and Electric Co.,* supra; *Jeakins v. City of El Dorado,* 143 Kan. 206, 53 P. 2d 798. An exception to the general rule also has been recognized with respect to defects in public streets on the theory they are necessary for the public use at all times and under all conditions. (*Harper v. City of Topeka,* 92 Kan. 11, 139 Pac. 1018; *Hibbard v. City of Wichita,* 98 Kan. 498, 501, 159 Pac. 399; *Foster v. Capital Gas and Electric Co.,* supra; *Smith v. Kansas City,* 158 Kan. 213, 146 P. 2d 660.)

We have, however, held, the city being duty bound to maintain its streets in reasonable repair for public use, is engaged in a governmental function in the process of their repair and improvement (*Foster v. Capital Gas and Electric Co.,* supra; *Parker v. City of Wichita,* supra) and that a city was engaged in the performance of a governmental function where one of its employees painted street numbers and signs on street curbings as a result of which no commercial or pecuniary interest of the city was being promoted. (*Wray v. City of Independence,* 150 Kan. 258, 260, 92 P. 2d 84.)

It also as been determined the construction and maintenance of sewers ordinarily is a governmental rather than a ministerial or proprietary function. (*Foster v. Capital Gas and Electric Go.,* supra.) In the Foster case this court took note of the fact that municipalities were held liable in certain of our earlier cases, now relied on by appellants, for negligence in carrying out, constructing or maintaining municipal improvements but that in the three cases mentioned the court did not consider or pass on the question whether the city was engaged in a governmental function. The Foster case, holding that a city ordinarily is not liable for negligence in the construction and maintenance of sewers, has been

cited with approval in subsequent cases. Some of them are *Bruce v. Kansas City, Parker v. City of Wichita, Smith v. Kansas City,* omnia supra. Decisions holding that ordinarily the construction and maintenance of sewers constitute governmental functions must not be confused with the decision in *Smith v. Kansas City,* supra, in which a sewer was indirectly involved and in which the city was held liable. As clearly indicated in that case, although the catch basin which had a defective lid was connected with the city sewer system, the catch basin was located in a portion of the street. Liability was there predicated on the ground the injury was caused by a defect in the street.

G. S. 1949, 13-401 provides, in part, the governing body shall have the care, management and control of the city and its property. G. S. 1949, 13-1019 authorizes cities of the first class to establish the grade of streets and alleys. G. S. 1949, 12-602 authorizes the paving, curbing and guttering of streets. G. S. 1949, 13-428 authorizes a city of the first class, "To alter and change the channels of streams and watercourses; to build and erect walls, levees and ripraps to protect or straighten banks of streams, and pay for the same out of the general-improvement fund. . . ."

Appellee also directs attention to G. S. 1949, 24-106. That section is a part of the drainage and levees act and pertains only to lands used for agricultural purposes and highways lying wholly outside the limits of incorporated cities. (G. S. 1949, 24-105.)

In the instant case the city committed no *ultra vires* acts outside its borders and all acts performed therein were expressly authorized by statute. We are not unmindful of the fact authority to act is not alone the legal equivalent of a command to act. Neither need we now hold performance of every authorized act necessarily constitutes exercise of a governmental function. We are presently concerned only with the specific acts of the city in this case.

The city was confronted with a rapidly increasing population occasioned primarily by the war. Increased housing facilities were an immediate necessity. The evidence discloses a proper drainage system was of paramount importance in this particular drainage area. All acts of the city, previously mentioned, constituted an integral part of the development of a drainage system. Adequate drainage was not merely a thing to be desired for the convenience of the inhabitants of the area. It was a necessity for the protection of the public health and welfare. Proper grading, curbing and drainage of streets are incidents to the construction and mainte-

nance of streets, a governmental function. The building of additional flumes for handling the flow of surface water served the same or a similar purpose to that of additional storm sewers. The authorized alterations in the watercourse constituted an integral part of an adequate drainage system. Under our decisions, previously noted, the acts of the city were performed in the exercise of governmental functions.

Although a city, its officers and employees, in the exercise of governmental functions, are not liable for negligence absent a statute expressly imposing such liability we pause briefly to consider the subject of negligence. Negligence is a necessary element of liability where a city acts in a proprietary capacity. A careful review of the record discloses no evidence of negligence *in the manner* the authorized acts were performed. The real complaint here is that by reason of the city's development the natural watercourse was filled beyond its capacity and overflowed appellants' property on July 31, 1950. Appellants' contention is the failure of cities to provide for the disposal and control of surface water after it leaves their borders should render them liable in damages. There can be no doubt the contention presents a subject most vital to both cities and individuals whose property may be affected. The principle involved is a matter of far-reaching consequence which transcends this or any other isolated case. If liability were imposed by judicial decree in the instant case it would be difficult in principle, if not impossible, to avoid imposing liability on cities, their officers and employees, absent a statute, in other fields of a city's governmental functions. The question might well be addressed to the legislature in whose province rests the responsibility to determine for what acts the state or its governmental subdivisions shall be liable. Presently we have no statute imposing such liability. Absent an act imposing liability on cities where they have acted in a governmental capacity, we think this court would not be justified in imposing it.

In the course of appellants' brief they mention the fact we have held a nuisance is an exception to the general rule of a city's immunity from liability. In none of appellants' expressly numbered contentions do they assert the instant action was predicated on a nuisance theory or that the acts of the city constituted the creation or maintenance of a nuisance. Their petition clearly is based solely on damage caused to their property on the specific date of July 31, 1950. Moreover, in their contention this action is not barred by

the statute of limitations insofar as the particular damages they now seek to recover, they expressly state:

"Inasmuch as plaintiffs suffered *no injury or no actionable damage* to their property prior to July 31, 1950, they had no cause of action prior to that date. . . ." (Our italics.)

We need, therefore, not pursue the nuisance theory.

We shall not further labor the opinion. We may, however, say that in considering appellants' various contentions we have not overlooked decisions of our own and from other jurisdictions cited by appellants in which municipalities were held liable but in which the subject of governmental functions was not raised or determined. Nor have we lightly considered cases from certain other jurisdictions supplied by the industry of appellants' counsel in which it has been held, under somewhat similar circumstances, the city acted in a proprietary capacity. On that subject, as applied to the instant acts of the city, we prefer the reasoning of numerous decisions from other jurisdictions which are in harmony with our own.

The judgment is affirmed.