No. 30,488.

MAUDE ACOCK, *Appellee*, v. THE KANSAS CITY POWER AND LIGHT COMPANY and THE J. A. TOBIN CONSTRUCTION COMPANY, *Appellants*.

(10 P. 2d 877.)

Opinion filed May 7, 1932.

*Fred Robertson, Edward M. Boddington,* both of Kansas City, *William C. Lucas* and *Ludwick Graves,* both of Kansas City, Mo., for appellant Kansas City Power and Light Company; *Edwin S. McAnany, Maurice L. Alden, Thomas M. Van Cleave,* all of Kansas City, and *Roy W. Crimm,* of Kansas City, Mo., for appellant J. A. Tobin Construction Company.

*David F. Carson* and *Russell L. Stephens,* both of Kansas City, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: This is an action by the widow of J. A. Acock, deceased, for his wrongful death, alleged to have been caused by the negligence of defendants. The jury answered special questions and returned a verdict for plaintiff, on which judgment was rendered. Defendants have appealed.

The pertinent facts may be stated as follows: The Kansas City, Kaw Valley & Western Railway Company, hereinafter called the railway company, operates an interurban electric railway from Lawrence to Kansas City on the north side of the Kansas river and north of the main line of the Union Pacific Railway Company. It has poles erected along its track with wires stretched across or arms extending over the track from which is suspended the wire which carries the electric current which operates its cars. This wire carries a direct current of 650 volts. On its poles along the north side of its track it has a telephone wire. The telephone is used by the dispatcher in giving orders to conductors and motormen for the movement of cars. The poles have cross arms on which the telephone wires are placed on ordinary glass insulators. At various places along the line it has telephone booths, from which those in charge of the train call the dispatcher for orders. One of these is located at a point on the line called City Park. The telephone booth there is a small square frame building with cinders for a floor, on which at the time in question a board was laid. On the inside of the booth at one side was a board shelf, perhaps eighteen inches wide, on which an ordinary desk telephone set was placed. The box for the telephone was above this board on the wall. The current

used for the telephone was from dry-cell batteries and produced a low voltage of a few ohms.

The Kansas City Power and Light Company, hereinafter called the light company, engaged in the manufacture, transmission and sale of electric energy, had a station called "Substation No. 7," just north of the Kansas river, into which wires entered carrying 33,000 volts alternating current. By a transformer at this station the lines going out of it to the north carried 6,600 volts alternating current. These lines crossed the lines of the railway company and served a near-by territory to the north of about fourteen square miles, in which there were more than eleven hundred subscribers for electricity. At the place where its wires crossed the lines of the railway company, lines were attached to it extending east so as to carry electric current to what is known as the Spitcaufsky crusher. This line had been built by the railway company, but was leased and operated by the light company. It is what is spoken of as a three-way circuit; that is, it consisted of three wires. These were attached to insulators, on what is spoken of as a wishbone attached to the poles. As constructed, the lowest one of these wires was about four feet above the telephone wires on the cross arms of the same poles. The lines to the stone crusher carried an alternating current of 6,600 volts.

Directly north of the railway company's right of way the J. A. Tobin Construction Company, hereinafter called the construction company, was constructing a county road, under a contract for that purpose, through what is known as the Muncie Bluffs. The work required removing a large amount of stone, shale and dirt. The place where the construction company was then operating was inaccessible to vehicular traffic. The construction company was using a steam shovel to make the excavation through the bluffs for the highway, and in order to make the stone and shale easier to handle by the steam shovel it blasted the stone and shale with charges of dynamite. On June 27, 1929, the employees of the construction company prepared a blast by drilling holes about sixteen feet into the bank, enlarging the bottom of them with a shot of one stick of dynamite, then placing in each hole twelve sticks of dynamite. Three of these holes were so prepared. It was arranged to fire this blast about the time the men quit work for the evening, and it was fired about six o'clock—perhaps a few minutes later. The result

was that stone and shale were thrown with such force and quantity as partially to destroy the steam shovel and to throw rocks and shale across the track of the railway company, breaking twelve of the sixteen telegraph wires along the right of way of the Union Pacific. Rock and shale were thrown against the poles of the railway company which carried its wires, including the telephone wire, and broke one of the insulators supporting the wire used by the light company, letting it fall until it came in contact with the telephone wire of the railway company. The employees of the construction company did not notify anyone connected with the railway company or with the light company of the damaging results of this blast,

Charles Malott was employed by the light company as a trouble man, whose duties were to take care of all trouble that might occur in the district about fourteen miles square served by the light company from its No. 7 substation. Soon after six o'clock the electric current went off in this district. He called either the service department or the trouble department of the light company from Welborn, which was in his district, told of the trouble, and that he was going to patrol the line. He went about as directly as he could to substation No. 7, traveling by automobile, in which he had equipment to make temporary repairs. On his way to substation No. 7 he saw nothing which would cause any trouble. In addition to the transformer at substation No. 7 there were automatic switches which worked by the operation of electricity. Trouble anywhere along the line served from that station would cause the switches to relay; that is, the switches would kick out, or turn off the power. When this was done the switch automatically replaced itself, connecting the power. If the trouble still existed it kicked out again, replaced itself and kicked out again, if the trouble still existed, but after the third time it would stay out until some one pushed it or forced it back. Malott made no other investigation of the line than along the route he traveled. When he got to substation No. 7 he found a fuse had been burned out and that the automatic switch was out and the power turned off. He replaced the fuse, then telephoned to the service department, or trouble department, and reported that he found the switch out. He was told to put it back in. He did so. This was before seven o'clock. He waited twenty or thirty minutes to see whether it automatically kicked out again.

It did not do so in that time and he went home and quit work for the day.

J. A. Acock had been employed by the railway company as a motorman about nine years. About the first half of that time he had been on what was called a "line car," that is, a car used to transport men and equipment to repair the line. He did not do the line work himself, but sometimes handed tools and repair parts to the workmen. He was familiar with the structure of the line and with the voltage of the electric currents carried by the wires. For about four years he had been motorman on passenger cars of the railway company and was serving in that capacity on June 27. A Mr. Kusler was the conductor on the car. They reached the City Park station about seven o'clock. Their time to leave there was 7:03. Both Acock and Kusler got off of the car and went into the booth to telephone the dispatcher for orders, it being their joint duty to receive such orders. Kusler went into the booth first and put the switch on the telephone. That was done by reaching up and putting the switch in with the hand. There is an insulated handle on the switch. He then stepped over to the board bench on which the telephone was sitting. That telephone had a cord on it which rested on the bench. He then took a book which he found there and was registering when he received a shock. He leaned his arm too close to the cord and got a shock through his coat sleeve. It gave him a backward shock, but did not throw him back. After that he felt a slight vibration on the board on which the telephone was resting. It was "kind of quivering." At that time Acock was just outside the door, and Kusler said to him, "Al, feel of this board." He remarked, "That telephone is hotter than hell, and I'm not going to call up the operator." Acock put his hand on the board to feel the vibration, and then reached for the telephone. Kusler had stepped over toward the door of the booth. As Acock reached for the telephone he fell backward into the booth and said, "Ah." Kusler went to pick him up. Acock said: "That is six hundred and sixty or six hundred and sixty-six, Lige." "Lige" was Kusler's nickname. Acock died almost instantly.

Kusler advised the railway company officials of Acock's death. An investigation that night was made of the line near where the blast had been fired by the construction company. The damages previously noted here were discovered. Representatives of the light

company also made an investigation, found the broken insulator which had let its line carrying a high current fall so as to come in contact with the telephone wire, put a new insulator on, and replaced the wire.

It seems clear from this recital, and in fact is substantially conceded in this court, that the blast fired by the construction company threw rock which broke the insulator to which was attached the wire of the light company carrying an alternating current of 6,600 volts, causing the wire to fall so that it came in contact with the telephone wire of the railway company, by which this current was carried into the telephone booth and received by Acock when he undertook to use the telephone, and resulted in his death.

The railway company was not made a party defendant to this action. The light company, by an amendment to its answer, alleged in substance that the railway company and J. A. Acock at the time of his death were operating under the workmen's compensation act of this state; that neither Acock nor his personal representative, within ninety days from the date of his death, filed with the railway company a written election that a remedy against an allegedly negligent third party would be claimed, and that by reason thereof an election was effectually made to accept compensation. By reason of this it is argued that under the statute (R. S. 1931 Supp. 44-504) this action could not be maintained by plaintiff. The point is not well taken. In *Jolley v. United Power & Light Corp.*, 131 Kan. 102, 289 Pac. 962, where a similar question was raised, it was held that the statute is intended for the benefit and guidance of the employer and employee. In the opinion it was said:

"The statute is apparently intended to make a definite disposition of a cause of action against a third party as between the employer and employee, but it does not go so far as to attempt to make this disposition irrevocable. . . . As pointed out in the Moeser case, *supra,* it is no concern of the third party what the employer or employee does with reference to a cause of action against the third party. No matter what they may do, the liability of the third party cannot be increased nor diminished by any action of theirs. The third party is in no way prejudiced by the failure to observe the provisions of the statute." (p. 107.)

See, also, *Moeser v. Shunk*, 116 Kan. 247, 226 Pac. 784, and cases collected in the annotations 37 A. L. R. 840 and 67 A. L. R. 254. The answer also alleged that plaintiff had claimed and received compensation from the railway company under the compensation act. There was no proof on this point and it may be disregarded.

It is argued that the railway company was negligent in not having a protecting device on its telephone wire at the booth at City Park, and in other respects. Even if it were conceded that the railway company was a joint tortfeasor with defendants, the light company and the construction company, plaintiff might, at her election, sue any one or more of the joint tortfeasors without making all of them parties defendant (*Wholesale Grocery Co. v. Kansas City et al.*, 115 Kan. 589, 224 Pac. 47), hence there is nothing in this point of which appellants can complain.

Appellants argue that J. A. Acock was guilty of contributory negligence as a matter of law. It is argued that he had been an employee of the railway company for many years; that he was familiar with the construction of the electric lines and wires along the railway right of way; that he knew the danger of a heavy charge of electricity, and even when his attention was called by the conductor Kusler to the fact that the telephone was hot, which meant that it was charged with a heavy current of electricity, and even after Kusler had declared that he would not use the telephone to call the dispatcher, Acock stepped forward and undertook to use the telephone and received the shock which caused his death. In this connection it is pointed out that the evidence discloses it was possible for Acock and Kusler to proceed with their car without talking to the dispatcher by conforming to the time card and by a system of signals, hence that it was not absolutely essential for them to call the dispatcher and get orders. We regard the question of the contributory negligence of Acock as being a fair question to submit to the jury. The evidence disclosed that while it did not happen every day it was not at all unusual for the conductor and motorman, when they went to use the telephone in one of the booths of the railway company, to find that it was carrying a charge of electricity much in excess of that produced by the batteries designed for the telephone wire. In such instances this probably came from the direct current of 650 volts used by the railway company as power for its cars. There was evidence that this current would not injure a man using the telephone standing on the floor of dry cinders, or on a board placed on such floor. Frequently they would find a telephone, or the board upon which it rested, so charged, but would go ahead and use the telephone without any ill consequences. In such cases they referred to the telephone or booth as being "hot," or as being "hotter than hell," which was a common byword or expression. The fact

that one of them would decline to call up over the telephone because of the fact that it was hot, and the other one go ahead and make the call without injurious consequences, was not unusual. On this point the jury, in answer to a special question, found that Kusler made the statement attributed to him, but "not as a warning to the extent of the danger." Defendants moved to set aside this answer as not being supported by the evidence, but in view of the evidence on that point the court overruled the motion. In view of that fact we cannot hold, as a matter of law, that Kusler's remark with respect to the telephone being hot was either intended by him or understood by Acock as a warning of danger. Answering another special question, the jury found Acock was exercising ordinary care and prudence when he reached for the telephone at the time and place in question. We cannot say, as a matter of law, that this answer was erroneous.

On behalf of the appellant, the light company, it is contended that the evidence did not show it to be negligent, and that the court erred in overruling a peremptory instruction in its favor. In answer to a special question the jury found the negligence of the light company to be that it "made no attempt to find source of trouble before closing switch" at substation No. 7. It is argued that the light company, in closing this switch under the circumstances shown by the evidence, was in fact and in law using due care; that it had then received no notice or information as to the cause of the switch being thrown out, and the jury, in answer to a special question, specifically so found. It is argued that the switch was so constructed that it would not stay in if there were trouble on the line; that frequently trivial interferences with the line caused the switch automatically to throw out; that when the switch is found to be out it is not practicable for a trouble man to go over all the lines of the light company served from the station—in this case about sixty miles of line spread throughout fourteen square miles of territory—to search for trouble which may be only temporary; that the common practice, when the switch is found out, is to put it in, and if trouble still exists it will automatically throw itself out; that any other plan would make such a burden upon the light company as to be unreasonable. But in this connection it must not be overlooked that the switch is so designed that it will throw itself out and in, automatically, as many as three times and then stay out if the trouble persists; that the light company's trouble man,

Malott, when the lights first went out, telephoned to headquarters that he would patrol the line; that in fact he examined only a small part of it. When he got to substation No. 7 he found fuses burned out, which he replaced; he found the switch out, which, from the nature of things, must have been out all of the time he was driving from Welborn to substation No. 7, tending to show serious trouble on the line. Unwilling then to take the risk of putting the switch in, he called headquarters and was told to put the switch in. Whether that was using due care or not depends upon many circumstances. He had stated that he would patrol the line. Possibly the one in charge at headquarters thought he had done so. The light company was bound to know that the trouble on the line was serious enough that the switch was automatically thrown out and in repeatedly until it stayed out for some time, hence that the trouble, whatever it was, was something more than a temporary trouble. It was bound to know the construction of its line over which it transmitted current, and to know that its line, when in place on the poles of the railway company, was but a few feet above the telephone wire; that a displacement of one of its wires from the insulator would cause it to drop so that it could connect with the telephone wire, a situation which the evidence shows could have been prevented at a nominal expense; that its heavy current of 6,600 volts might cause the telephone line to be burned in two at some places, as the evidence shows was done in this case, and might cause its current to pass on some lines other than its own, to the injury of some one. In view of this we are convinced that whether the connecting of this switch by the light company at the time and under the circumstances shown by the evidence was negligence was a question for the jury, and, further, that there is evidence to support the findings of the jury on that point.

The light company complains of the court's refusal to give instructions requested and of instructions given. We have examined all counsel have said on this point and find no substantial merit in the complaint. The instruction given did not, as contended by the light company, make it an insurer. It told the jury that the duty of the light company was to exercise care proportionate to the risk and dangers of its business; that the degree of care required varies according to the circumstances of the particular case; that if in the use of electricity by the light company in the conduct of its business it was shown by the evidence to be a highly dangerous

agency to life, unless exercised with great care, then to such extent a high degree of care in its supervision, management and use was required by the light company. This is the general, well-recognized rule of law and accords with the previous holdings of this court. (*Lewis v. Street Railway Co.*, 101 Kan. 673, 168 Pac. 856; *Stone v. City of Pleasanton*, 115 Kan. 378, 223 Pac. 312; *Serviss v. Cloud*, 121 Kan. 251, 253, 246 Pac. 509; *Baker v. Kansas Power and Light Co.*, 127 Kan. 109, 113, 272 Pac. 101.)

The light company argues that even if it were negligent in closing the switch at substation No. 7 and sending the current over this line at the time and under the circumstances it did, such negligence was not the proximate cause of the death of Acock; that there was a separate, unrelated cause, namely, the negligence of the construction company in firing the blast as it did. The construction company contends that if it were negligent in the respects the jury found it to be, namely, in that the charge of dynamite was not properly placed for its size, and that it failed to report to parties concerned after it knew damage had been done, such negligence was not the proximate cause of the injury, and argues that there was a separate, intervening cause, namely, the pushing in of the switch and turning on of the current by the light company after it knew there was serious trouble on the line and without proper inspection of it. Under the evidence in this case these were not separate, intervening causes. Here both parties were negligent. While it is true that one succeeded the other in time, they are necessarily related and interwoven, and the death of Acock was the result of the concurrent negligence of both appellants.

In 1 Shearman and Redfield on Negligence (6th ed.), section 122, the applicable rule is thus stated:

"Concurrent, as distinguished from joint negligence, arises where the injury is proximately caused by the concurrent wrongful acts or omissions of two or more persons acting independently. That the negligence of another person than the defendant contributes, concurs or coöperates to produce the injury is of no consequence. Both are ordinarily liable. And unless the damage caused by each is clearly separable, permitting the distinct assignment of responsibility to each, each is liable for the entire damage. The degree of culpability is immaterial. And so when the injury is the result of the neglect to perform a common duty. Whether charged with joint or concurrent negligence all parties contributing to produce the injury by their responsible acts or omissions, may, at the option of plaintiff, be joined as defendants in the same action."

See, also, the following cases and authorities cited therein: *Luen-*

gene v. Power Co., 86 Kan. 866, 122 Pac. 1032; McDaniel·v. City of Cherryvale, 91 Kan. 40, 136 Pac. 899; Leonard v. Cement Co., 91 Kan. 735, 139 Pac. 478; Pinson v. Young, 100 Kan. 452, 455, 164 Pac. 1102; Gooch v. Gooch, 108 Kan. 416, 418, 195 Pac. 874; Swayzee v. City of Augusta, 113 Kan. 658, 666, 216 Pac. 265; Webb v. City of Chanute, 118 Kan. 505, 235 Pac. 838; Farmers Grain Co. v. Atchison, T. & S. F. Rly. Co., 120 Kan. 21, 24, 245 Pac. 734; Lenfestey Broom Works v. Atchison, T. & S. F. Rly. Co., 123 Kan. 104, 107, 254 Pac. 343; Mosby v. Manhattan Oil Co., 52 F. 2d 364-366.

The construction company argues, as does the light company, that Acock was guilty of contributory negligence, and that plaintiff, because of the provisions of the compensation act (R. S. 1931 Supp. 44-504) could not maintain this action. But the construction company is in no better position to plead those matters than is the light company. What has been heretofore said on those questions is deemed sufficient.

It is argued that the special findings of the jury are inconsistent with each other, and that some of them are not supported by evidence. We have examined those questions and find them to be without substantial merit.

Finally it is argued by the light company that the amount of the verdict, $10,000, is excessive. At the time of Acock's death he was forty-nine years of age. His life expectancy was 21.63 years according to the American experience table of mortality. He had been employed regularly for about nine years by the railway company. He was paid by the hour and received a check every two weeks. It was usually around $75, but at times was as much as $125. Plaintiff got his check, which was the sole means of her support. It is true there was not a close separation in the evidence of the amount of his wages necessary for his own support as distinct from that of the support of his wife and children. It is said the evidence did not disclose the condition of his health, but there is nothing in the evidence to indicate that his health was impaired, and his steady employment for nine years with the railway company previous to his death tends to show that it was good. The record will not justify us in saying that the amount of the verdict was not warranted.

The judgment of the court below is affirmed.