No. 33,369

JUNE TILDEN, a Minor, by G. F. TILDEN, Her Father and Next Friend, *Appellee*, v. (C. W. ASH, EVERETT ASH et al., *Defendants*) ALBERT LaCROIX and E. ROUND, *Appellants*.

(67 P. 2d 614)

Opinion filed May 8, 1937.

*T. F. Railsback,* of Kansas City, and *E. H. McVey, C. A. Randolph, S. L. Smithson* and *Stanley Garrity,* all of Kansas City, Mo., for the appellants.

*Edward F. Arn,* of Wichita, and *Wm. H. McHale,* of Kansas City, for the appellee.

The opinion of the court was delivered by

WEDELL, J.: This was an action for damages to a minor, resulting from a collision of motor vehicles. The action was brought by the minor daughter through her father and next friend. Plaintiff recovered judgment against five defendants, but only two of them, Albert LaCroix and E. Round, appeal.

The accident occurred at a multiple intersection of highways located about one fourth mile north of the village of Williamstown, but not in the intersection proper and entirely off the highway. A description of the roads, together with the illustrative map hereto attached, will help visualize the scene of the accident. The accident occurred on May 11, 1935. State highway No. 10 between Topeka and Kansas City passed north of Williamstown. It is now U. S. No. 24. U. S. highway No. 73W came from the north and curved to the east before reaching No. 10, and continued eastwardly on the same slab as No. 10. U. S. No. 73W is now U. S. highway No. 59. There is a short state highway known as No. 76, which runs from the village of Williamstown north to and intersects state highway No. 10. It forms a right-angled intersection with No. 10. There are two curves from highway No. 76 which begin south of No. 10. One curve turns to the east, the other to the west, and both terminate in highway No. 10. On the other hand, No. 73W, now No. 59, comes down from the north and two curves of much longer radii branch off, one going to the southeast and the other to the southwest. State highway No. 10 which was also No. 73W, east of the junction, is normally an eighteen-foot slab. When it reaches a point several hundred feet from the right-angled intersection, it widens out to nineteen feet, four inches, then to nineteen feet, six inches. The easterly curve on No. 73W, now No. 59, is twenty-two feet, two

Plow Share Point

WINDMILL

Sketch Of Intersection

N

inches wide. It will be observed these roads result in the formation of four triangular segments of ground. The easterly point of the northeasterly triangular sector was denominated the "plowshare point," during the trial and by the jury in its special verdict.

June Tilden, the minor eleven years of age, was accompanying her father and mother from Topeka to Kansas City. They were traveling east on highway No. 10, in a Studebaker car. A truck owned by defendants Ash, described in the record as a yellow truck, was traveling west on the same highway. This truck was seven feet and seven inches wide. It had an enclosed top. When empty it weighed 5,500 pounds. It was carrying a load of about 5,000 pounds. Ash & Son Transportation Company was a partnership consisting of defendants C. W. and Everett Ash. They were engaged in the trucking business. Their Chevrolet truck was being driven by defendant Woodworth. He was accompanied by William Fleischer. Appellants Albert LaCroix and E. Round lived at Hiawatha. They were traveling south in a red Ford truck on U. S. highway No. 73W, now U. S. No. 59, and were bound for Lawrence to inspect some fence posts. Their truck weighed a ton and a half. It was empty and had a flat bed. Appellants, together with the owners and driver of the Ash truck, were charged, as joint tortfeasors, with being responsible for the collision between the Ash truck and plaintiff's car, and the resulting injury to June Tilden.

Appellants contend the trial court erred in overruling their demurrer to plaintiff's evidence. In passing on a demurrer to evidence, the court was, of course, required to give full credence to plaintiff's evidence, and to view that evidence in the light most favorable to plaintiff, and to allow all reasonable inferences in her favor. (*Hill v. Southern Kansas Stage Lines Co.,* 143 Kan. 44, 53 p. 2d 923; *Hayes v. Reid,* 145 Kan. 51, 64 P. 2d 19, and citations.) In considering a demurrer to evidence, the court takes into consideration only those facts and reasonable inferences therefrom which are favorable to the party adducing them and not facts or inferences favorable to the party demurring. (*Meneley v. Montgomery,* 145 Kan. 109, 64 P. 2d 550, and citations.) With those rules in mind we shall briefly review the evidence offered in behalf of plaintiff.

G. F. Tilden, the father of the minor, testified in substance: The accident occurred north of Williamstown about twenty miles east of Topeka; he was driving a Studebaker sedan in an easterly direction

on highway No. 10; the accident occurred about two-thirty p. m. of May 11, 1935; he and his wife were in the front seat and had the little girl between them; they had crossed the bridge and main intersection of state highway No. 76W, and highway No. 10; he estimated the distance from the bridge to the point of the accident at about three or four hundred yards; he first observed the Ash truck when it was some distance east; he observed appellants' truck as it was traveling southeast on the curve, and when it was southeast of the slow sign located on that curve; the two trucks were traveling about the same speed, when he first observed them, approximately twenty-five, possibly thirty miles per hour; it seemed the Ash truck speeded up as it approached his car; the Ash truck was on the north side of No. 10; he had reduced his speed from about forty miles per hour to around thirty or thirty-five right after he left the bridge; his reason for doing so was he did not know whether the Ash truck would turn south to Williamstown or whether it would go straight ahead; when he reached the north-and-south road, state highway No. 76, he had slowed down to about fifteen miles per hour.

"Q. . . . Now, where did you first see the red truck, Mr. LaCroix's truck? A. Well, the best way I can state that is, I got past this north-and-south road and was almost up to this 'V' of gravel between the 'Y' and the main road, and at that time I noticed Mr. Ash's truck seeming to come onto *my side* of the road, and I glanced over and saw the red truck at that time." (Italics inserted.)

Appellants' truck was moving in at a pretty good clip and it didn't look to him as though it were going to stop.

"Q. What is your best judgment of the speed of the red truck just before it got to highway No. 10? A. Possibly twenty-five miles an hour, at the time they—right at the turn."

It seemed to him neither of the trucks were slowing up; he thought they might go into each other and he didn't want to be there; the Ash truck was coming at about thirty-five to forty miles per hour; he had noticed the Ash truck swerved slowly from the north side of highway No. 10; he then angled across from the south side of the slab onto the shoulder and later got entirely off the slab; he didn't know whether the two trucks crashed or not; at the time the Ash truck swung or turned to the left, appellants' truck was occupying the north half of the traveled portion of No. 10; when the Ash truck passed appellants' truck, the latter was headed east; appel-

lants' truck did not go in front of the Ash truck, but went to one side of it and was covering most of the north side of the highway No. 10; when he saw what the trucks were doing he thought only of getting off the road because the Ash truck was on his side of the road; when the Ash truck went around appellants' truck he was busy trying to get into the ditch and out of the road, and the Ash truck headed straight toward him; he stopped in the triangle south of highway No. 10, and was clear off the highway and practically at a standstill at the time of the crash. (Plaintiff drew a line, as indicated on the map, showing the course of his car until it stopped at the point of collision.) He made observations of the view a person had coming from the north to highway No. 10, and from the east on highway No. 10; coming from the north there was no obstruction of highway No. 10 to the east or to the west; he could look a half mile down there.

Eva Tilden, the mother, testified in substance: Quite some distance before the Ash truck passed appellants' truck, the Ash truck was on the right side of No. 10; as the Ash truck passed appellants' truck, the Ash truck came over to the left side of the road; the truck from the north was in front of the Ash truck and caused the Ash truck to turn to the left; the trucks passed each other parallel, appellants' truck heading east on the north side and the Ash truck heading west on the south side; just before the accident she saw the trucks and it looked like they were going to crash; Mr. Tilden pulled to the right of No. 10 and went straight to the drainage ditch on the south side.

June Tilden, the minor, testified in substance: They were going east and a truck from the east struck our car; she saw two trucks, a truck coming from the north and a truck coming from the east and she thought they were going to crash, but the truck coming from the east swerved out around the other truck and came toward them and hit their car.

Wendell Swain, a mechanic from Topeka, testified in substance: He went for the Tilden car; the truck was lying on its side and on the back end of the Tilden car; he moved the truck; the windmill was about thirty feet south of the slab, and the back end of the truck was about four feet south of the slab; there were tracks which were traced to the Tilden car; they came from the soft shoulder of the slab.

Earl Sturm, a farmer and an eyewitness to the accident, testified

in substance: At the time of the accident he was about one hundred yards east of the junction and on the south side of No. 10; the collision between the Tilden car and the Ash truck occurred between twenty and thirty feet west of the windmill and between the windmill and the slab; as the Tilden car came off the bridge it was running about thirty to thirty-five miles an hour; at that time the Ash truck was about fifty yards farther east than where he (Strum) was standing and it was proceeding west on the north side of No. 10; when the Ash truck was even with him he observed appellants' truck; the Ash truck passed him and cut off his view from the Tilden car; he did not see it again until he heard the crash; the Ash truck turned to the left a little as it went around appellants' truck, which latter truck was between five and seven feet north of the center line of No. 10; the right fender of appellants' truck was between three and six feet out upon No. 10; at that point the slab is eighteen feet wide; he didn't hear any crash when the trucks passed; they came very close, but he didn't know whether they touched; appellants' truck went east; when he first saw appellants' truck it was traveling between twenty-five and thirty miles an hour and gradually reduced its speed until it stopped or nearly stopped; the Ash truck was traveling about thirty-five miles an hour and did not change its speed much, if any; the Ash truck was traveling mostly, if not entirely, on the north side of No. 10 before it swerved to the south; it then swerved back to the north; it made a figure "S"; he didn't think it got entirely back on the north side of the road before it swerved south again; when it made the first swerve appellants' truck was in its path; it had to turn to the south or hit that truck; he did not know what caused the Ash truck to swerve to the south a second time; the Ash truck just made a quick figure "S"; when the driver of the Ash truck turned around appellants' truck, he tried to get back into his proper position and succeeded in part and then turned to the south, or his left.

In support of their demurrer appellants contend this case does not present a question of primary or secondary highways, that highway No. 73W on which they were traveling continued east on the same slab as highway No. 10, there was only a slow sign and no stop sign which required them to come to a full stop before entering onto highway No. 10, and there was no contact between the trucks. With all these facts conceded it was still a question for the jury whether appellants, driving onto No. 10 and into the path of an approaching

truck, traveling at thirty or thirty-five miles per hour, were acting in the exercise of reasonable care for the protection of occupants of a vehicle approaching from the west in plain view. If appellants had not driven onto No. 10 as they did, there would have been no occasion for the Ash truck to swerve into the proper lane of an approaching car from the west. Except for appellants' conduct the Ash truck could have proceeded westerly by remaining on its proper north side of the slab and the Tilden car could have proceeded east on the south side of the highway which it was rightfully occupying. Because the driver of the Ash truck was also guilty of negligence it does not follow appellants were free from negligence. The fact appellants' truck did not strike the Ash truck does not relieve them of liability for the damage which their conduct, combined with the negligence of another, wrought upon an innocent third party. In volumes 3-4, Huddy's Cyclopedia of Automobile Law, it is said:

"The negligence of a driver in forcing another traveler off the road may be the proximate cause of injuries received by the latter through a collision with an object outside of the road." (p. 48.)

In the Fifth Cumulative Supplement of the same volume (Ann. to p. 49) it is said:

"Actual contact between plaintiff's and defendant's vehicles, or between defendant's vehicle and a streetcar in which the injured person was a passenger, is not necessary, if defendant's negligence resulted in situation proximately causing injury." (p. 6.)

See, also, *Grier v. Scandura*, 112 N. J. L. 152, 169 Atl. 674, and *Meyer v. Niedhoefer & Co.*, 213 Wis. 389, 251 N. W. 237.

It is further contended the speed of the Ash truck was the proximate cause of the accident. It undoubtedly was one of the proximate causes, and the jury so found. It was, however, not the only proximate cause. Of course, if the Ash truck had stopped there would have been no collision. On the other hand, if appellant's truck had not entered into the lane of traffic of the oncoming Ash truck there would have been no occasion for the Ash truck to swerve to the south. The damage caused by the negligence in the operation of each of the trucks is not clearly separable so as to permit a distinct assignment of responsibility to each, and, hence, each of the tortfeasors is liable for the entire damage. (*Acock v. Kansas City Power & Light Co.*, 135 Kan. 389, 398, 10 P. 2d 877, and citations.) The negligence of each of the truck drivers was substantially concurrent. In the Acock case it was held:

"Concurrent negligent acts of two or more parties render them liable as joint tortfeasors." (Syl. ¶ 5.)

The negligence of both truck drivers was a proximate cause. In *Pinson v. Young*, 100 Kan. 452, 164 Pac. 1102, it was said:

"It is next contended that the fire and not negligent storage of the dynamite was the proximate cause of Pinson's wrongful death. Both were proximate causes. The fire alone would not have caused his death. The dynamite alone might not have caused it. Perhaps the fire was the result of negligence. The storage of the dynamite was undoubtedly so. These two contributing delinquencies, the fire and the negligent storage of the dynamite—both proximate—wrought this result. (And citations.)" (p. 455.)

Appellants, however, contend there was only evidence to show what caused the Ash truck to swerve the first time as it passed around their truck, but that there was no evidence to show what caused it to swerve to the south again after it had started back to the north. True, there was no direct testimony as to whether the second swerve to the south was occasioned by the momentum of the first swerve to the south and the attempt to quickly get back to the north side of the slab. The testimony of Earl Sturm was: "The Ash truck made a quick figure S." Under all the circumstances this testimony was sufficient to take the case to the jury on the question of what factor or factors occasioned the quick second turn of the Ash truck to the south. There was sufficient evidence to warrant a reasonable inference that the two factors combined, namely, the speed of the Ash truck and the location of appellants' truck, were responsible for the swerving motion of the Ash truck, and the collision which followed. In the restatement of the law by the American Law Institute, on the subject of Torts, it is said:

"If the effects of the actor's negligent conduct actively and continuously operate to bring about harm to another, the fact that the active and substantially simultaneous operation of the effects of a third person's innocent, tortious or criminal act is also a substantial factor in bringing about the harm does not protect the actor from liability.

"Comment: a. Although in the great majority of cases to which the rule stated in this section is applicable, the effects of the conduct of both the actor and the third person are in simultaneous active operation, it is not necessary that their operations shall be absolutely simultaneous. It is enough that the two are in substantially simultaneous operation, as when the effect of the conduct of one or the other has ceased its active operation immediately before the other's conduct takes active effect in harm to the other.

"b. If the harm is brought about by the substantially simultaneous and active operation of the effects of both the actor's negligent conduct and of an act of a third person which is wrongful towards the other who is harmed, the

conduct of each is a cause of the harm, and both the actor and the third person are liable." (§ 439.)

In the Acock case, *supra*, it is said:

"Under the evidence in this case these were not separate, intervening causes. Here both parties were negligent. While it is true that one succeeded the other in time, they are necessarily related and interwoven, and the death of Acock was the result of the concurrent negligence of both appellants." (p. 398.) (See, also, *Mayhew v. DeCoursey*, 135 Kan. 184, 10 P. 2d 10.)

The demurrer was properly overruled.

The jury made the following findings of fact:

"1. Immediately prior to the collision at what rate of speed, in miles per hour, was the Ash truck proceeding westward in the regular westbound trafficway or north nine feet of the slab of highway No. 10 toward and intending to pass the junction of highway 73W therewith? A. Approximately thirty-five miles.

"2. Immediately prior to the Ash truck's reaching the junction of highway 73W with highway No. 10, did the LaCroix red truck either wholly or partly enter into the northerly half or regular westbound trafficway of highway No. 10 and either stop or proceed eastwardly thereon? A. Partly—Proceed.

"3. If you answer the foregoing question 'yes,' did the driver of the Ash truck, to avoid colliding with the LaCroix truck, have to swerve to the left so as to bring the Ash truck partly or wholly into the south half or eastbound trafficway of highway No. 10? A. Yes."

(The instruction was that if the jury answered question No. 3 "yes," they should not answer questions four and five. They did so answer it and those questions are omitted.)

"6. If you find that the Ash truck swerved to the south in passing the LaCroix truck, and, in doing so, either partly or wholly occupied the south or eastbound trafficway of highway No. 10, did G. F. Tilden, while driving eastwardly on said south half or eastbound trafficway of highway No. 10, see the Ash truck so swerve? A. Yes.

"7. If you answer the foregoing question 'yes,' then did Tilden, to avoid colliding with the Ash truck, by an 'S' turn northerly and then southerly, or by a direct turn southeasterly, drive off the slab toward the point of collision? State which you find to be the fact. A. Direct turn southeasterly.

"8. Did the driver of the Ash truck, after swerving around the LaCroix truck, swerve northerly and by an 'S' turn head southerly off the slab to the point of collision? A. Yes, slight 'S' turn.

"9. If you answer the last question 'yes,' did the driver of the Ash truck make the north and southerly turn to the point of collision in an effort to, and belief that by so doing he would avoid colliding with the Tilden automobile? A. No.

"10. If you answer the last question 'no,' state what cause or motive made the driver of the Ash truck, Woodworth, turn his truck in a manner that

brought about the collision with Tilden's car. A. Too much speed and lost control.

"11. If you find a verdict against the defendants, Ash & Son and Wendell Woodworth, or either of them, state specifically each act of negligence on the part of either of them that caused the collision. A. Entering the junction at too great a speed to have complete control of truck.

"12. State the speeds which you find from the evidence the three automobiles involved in this case were being driven as follows: (a) The red Ford truck as it came even with the plowshare point mentioned in the evidence: A. About five miles. (b) The Chevrolet truck as it passed the red Ford truck. A. Thirty-five miles. (c) The Studebaker sedan in which the plaintiff was riding as it approached and proceeded through the intersection. A. Fifteen miles.

"13. On what highway or highways was the red Ford truck traveling at all of the times involved in this case? A. 73W and No. 10.

"14. Which of the three motor vehicles mentioned in the evidence in this case made use of their brakes? A. Studebaker car and Ford truck.

"15. In passing the red Ford truck, did the Chevrolet truck swerve to the south? A. Yes.

"16. If you answer the foregoing question 'yes,' after swerving to the south did the Chevrolet truck again return to the north or its right-hand side of the highway? A. Partly.

"17. If you answer the foregoing question in the affirmative, did the Chevrolet truck of Ash & Son again turn to the south or its left-hand side of the highway? A. Yes.

"18. If you find from the evidence that the Ash & Son Chevrolet truck turned to the south or its left a second time, what caused the driver thereof to turn to the south or left the second time? A. Too much speed and loss of control.

"19. If you find the defendants, Albert LaCroix and E. Round, to be liable to the plaintiff in this case, of what specific acts of negligence do you find the defendants, Albert LaCroix and E. Round, to be guilty? A. For pulling a few feet onto highway No. 10 in the path of the Ash & Son Chevrolet truck.

"20. When the LaCroix red Ford truck came up within twenty-five feet of the point where the Ash & Son Chevrolet truck later swerved around it, how far to the east was the Ash & Son Chevrolet truck? A. Approximately fifty feet."

Appellants contend the trial court erred in not sustaining their motion to strike findings two and three. The grounds stated for the motion were the findings were not supported by evidence and the evidence was contrary thereto. Finding number two discloses appellants did not stop entirely, but proceeded eastwardly. The finding is supported by substantial evidence. It is seriously urged finding number three is incorrect, as the Ash truck could have turned and gone north on No. 73W or it could have done what it did do and that was to swerve to the left and miss appellants' truck. There was

ample evidence it could not do the former and that when it did the latter it entered at least partly into the lane of the approaching car. Whether upon being suddenly confronted with a truck in its path of travel it could have swerved to the south with safety, an exact distance which would have kept it north of the center of No. 10, was a proper question for the jury. It was the first turn of the Ash truck to the south which compelled it to swerve over the center line. The abstract discloses the following testimony of the witness, Woodworth, the driver of the Ash truck:

"I thought they [referring to appellants] were going right on and I would go in behind it. But, instead of going on their side they came right down my side of the highway. . . . That he was pretty close when he observed the car coming toward him as he had described, and he *dodged* to his left side, and said that *it was the only side he could dodge to.* He said he *jerked* his car over to the *south side* and as soon as he got over there he saw the Studebaker coming in the road ahead of him." (Italics inserted.)

There was ample other evidence to support finding number three. It is further urged the trial court should have sustained appellants' motion for a directed verdict and also its motion for judgment *non obstante veredicto.* These contentions are grounded on the theory the speed of the Ash truck was the proximate cause of the collision and that the second turn of the Ash truck to the south was uninfluenced by appellants. The demurrer to the evidence was predicated on the same theory. What we said under that heading applies with similar force here. It is, however, urged the jury cleared appellants of liability. The theory is that three findings in particular, namely, ten, eleven and eighteen, disclose the proximate cause of the collision was loss of control of the Ash truck, and that such loss of control was due to its excessive speed. In order to ascertain the complete cause for loss of control these findings must be construed with the findings which fasten negligence on appellants. The effect of findings nineteen, two and three, is that the negligent acts of appellants set in operation, or contributed to set in operation, the swerving motion of the Ash truck. There was no evidence of swerving by the Ash truck, owing to its speed of thirty or thirty-five miles per hour, until it was confronted with appellants' truck, which it endeavored to avoid striking. The driver of the Ash truck attempted to explain the reason for his second turn to the south. The substance of his testimony in that regard was that when he returned toward the north side of the slab, the Tilden car was moving in that direction. The jury did not believe that explanation. The swerv-

ing motion combined with the speed culminated in the loss of control and the resulting damage. We thus find two proximate causes operating substantially concurrently and producing the collision. The trial court did not err in its rulings on these motions.

Appellants also insist the trial court erred in failing to give a requested instruction in behalf of appellants on the issue of an emergency insofar as such instruction was given on the defense theory of the other defendants. One difficulty with that contention is the other defendants had pleaded an emergency and issues were joined with them on that theory. Appellants did not plead such defense and were not entitled to an instruction outside of the issues on which they had elected to try their lawsuit.

Appellants seriously urge the trial court erred in giving a certain instruction on proximate cause. The complaint in the main is there was nothing in the instruction which advised the jury that an act or acts of appellants must constitute a substantial factor in bringing about the injurious result in order to make them liable. Other instructions adequately advised the jury as to the meaning of proximate cause and that if the acts of negligence on the part of some defendant or defendants were not a proximate but only a remote cause of the occurrence the jury would be obliged to find in favor of such defendant or defendants. Upon a review of the instructions as a whole, we are of the opinion they are not subject to serious complaint.

Appellants finally urge the verdict of $10,000 is excessive. It was originally $12,500, the amount requested in the petition. The mere fact a jury returns a verdict for the full amount sued for does not render the verdict excessive. (*Stanfield v. F. W. Woolworth Co.,* 143 Kan. 117, 53 P. 2d 878.) On the argument of the motion for a new trial and other post-trial motions, the trial judge had the child brought into the courtroom in order that he might see and better observe and review her injuries and disfigurement and thus properly pass on the motion for a new trial. In fairness to all concerned, that was a prudent and sensible thing to do as it was essential the verdict should have the approval of the independent judgment of the trial court. Upon careful consideration and although the trial court was of the opinion the serious injuries sustained would probably support the full verdict, it was ordered the motions of defendants for a new trial would be sustained unless plaintiff agreed to a remittitur of $2,500. The remittitur was accepted and judgment was rendered for

$10,000. While this is a substantial sum, we have serious difficulty in holding the final verdict excessive. It is not contended here the verdict was the result of either prejudice or passion. The little girl was eleven years old. It is conceded she was a talented juvenile musician and possessed an unusual personality. Even at her tender years her ability as a musician was not speculative. She had given two individual piano recitals at the Kansas City Conservatory of Music. The first was given at the age of seven, the other at the age of eight. One of the injuries was to her left wrist. She had done practically no musical work from the date of the accident, which occurred about thirteen months before the trial. She still suffered pain in her wrist. In this connection the trial court said:

"The wrist injury is not a trifling injury, as I see it. I can see a great difference between the left wrist and the right wrist, in the ability, which means a lot when you consider the matter of playing the piano, and it should not be regarded so lightly."

Probably less serious but of some consequence was the permanent scar on her wrist. She had also suffered a broken clavicle. Three teeth were loosened and one was broken. Dr. Ray Woodworth, a dentist whose practice was limited to orthodontia, thought she would be obliged to wear the mechanism which moves the teeth and surrounding structure about six or eight months longer. He had treated the child for about one year. He testified:

"It is impossible to separate the work done for the broken and loosened teeth and the others because it all works in conjunction with the rest of the mouth. The three teeth will have to have considerable work in the future. Those teeth can't be fixed at her age. The teeth that were chipped are serviceable teeth, but I mean to distinguish between serviceable and normal teeth."

For several months after the accident the child walked with a limp. Her back and side gave her trouble.

Dr. Penfield Jones testified in substance: She had suffered a severe laceration of her face; it started from below the middle of the lower lip and extended half way to the ear, maybe a little farther; at one place on the cheek it extended clear through the inside of the mouth; you could pull that part apart and look down into the inner part of the mouth; the cut was very jagged and looked almost as if it were a torn cut; he sewed it up; he has not seen her since Doctor Padgett treated her and the scar is a permanent disfigurement; the cut was clear through the epidermis and even through the tissue and muscle of the mouth; when he saw her two months after the plastic operation, her lip was pulled down to the left a little bit; scar tissue is

a repair tissue and never has the vitality, after it has once formed, to grow or to do anything but remain stationary; at her age the tissue will grow some; it is very likely that side of her face will become out of proportion again as she grows into womanhood.

Dr. Earl C. Padgett, a specialist in plastic surgery, testified in substance: The child had a heavy scar on her lower lip and left cheek; he removed the scar on August 29, 1935; the reason for removing the scar was that it was rather heavy and it was raised; after such a scar is once removed, it tends to become heavy again; he removed it a second time and applied radium later in an attempt to reduce the heaviness of the scar; the heavy portion is what is called a keloid scar; the date of the second operation was December 26, 1935; in performing an operation on such a scar the scar is cut out and sewed up again as carefully as possible; the scar at first was raised to about the size of a match and it was red; the cut had gone through her lip and she now has a scar on the inside of the lip; after the two operations and radium treatments there was nothing further he could do for the scar; in his opinion the scar would remain for the rest of her life as it was at the time of trial; at the time of the second operation on her face he removed a ganglion, which is a little outcropping of the capsule of the wrist joint.

Dr. C. E. Joss, a surgeon of twenty-five years' experience, testified in substance: The cut extended up into her cheek or side of her face about three inches; scar tissue does not grow as a rule and it continues to contract; as the child's face gets larger it may require further surgery; he saw the child on June 3, 1936; there was a difference between the left and right side of her face; the left side, being the side on which she had the scar, was flat as compared with the right side; the difference was obvious.

In the light of all the circumstances we are not inclined to disturb the verdict.

Appellants have presented an able brief. We have noted the numerous decisions cited, but time nor space will not permit of their analysis in an already too lengthy opinion. We believe appellants have had a fair trial, and the judgment is affirmed.