No. 33,837

RANDALL ATKINSON, *Appellee*, v. THE CARDINAL STAGE LINES COMPANY and THE TRINITY UNIVERSAL INSURANCE COMPANY, *Appellants*.

(80 P. 2d 1073)

Opinion filed July 9, 1938.

C. H. Brooks, Howard T. Fleeson, Fred W. Aley, Carl G. Tebbe, Wayne Coulson and Paul R. Kitch, all of Wichita, for the appellants.

C. L. Kagey, Hal M. Black, L. M. Kagey, all of Wichita, C. W. Burch, B. I. Litowich, LaRue Royce, L. E. Clevenger, E. S. Hampton, R. E. Haggart, all of Salina, and H. S. Gurley, of Blackwell, Okla., for the appellee.

The opinion of the court was delivered by

SMITH, J.: This was an action to recover damages for injuries incurred in an automobile collision. Judgment was for the plaintiff. Defendants appeal.

The collision occurred about 10 a. m. about two and one half miles south of Lindsborg on U. S. highway 81. At the place where the collision occurred the highway runs north and south. There is a gradual rise toward the north from the place of collision. It is paved with an oil mat. This mat was originally twenty-four feet wide, but the edges had been broken off. At the time of the collision the traveled part of the highway was twenty feet wide. Prior to and at the time of the collision plaintiff was driving a Ford roadster north. He was on the right-hand side of the highway, traveling at the rate of fifteen or twenty miles an hour. Behind the Ford a Cardinal Stage Lines bus was being driven in the same direction. Two cars were coming from the north, being driven in the opposite direction from that in which the Ford was being driven. Plaintiff and the person in the car with him were both deaf mutes. The collision occurred when the driver of the bus drove around the car plaintiff was driving. As it started around the Ford it hit the left rear of the Ford. As it pulled back to the right-hand side of the road after having passed the Ford, it hit the left front of the Ford. This caused the plaintiff to lose control and the affair ended with plaintiff's car upside down in the ditch. The two cars coming from the north were being driven at the rate of forty-five to fifty miles an hour. The bus was being driven at about the same rate of speed. All the cars were on the proper side of the highway.

The story of what happened may be told here in the language of the bus driver. He testified, in part, as follows:

"I was going north in the same direction the Ford was and I got back behind the Ford about 300 feet. There was a car coming from the north, traveling south, and I started judging where these two cars were going to meet and where I would be at that time, to see if there would be—when they passed that I wouldn't be too close to them for safety. When I got up about 200 feet behind the Ford I saw that I was gaining on the Ford a little too much for safety for this other car from the north to meet this Ford and pass and make room for me to pass the Ford, so I applied a little air on my brakes then. At that time the Ford was on his right side of the road toward its center. Had there been a black line or white line marking the center of the road he would have been about a foot or foot and a half from the line; that is, the left side of

his car. The car coming from the north was about the center of his right side of the road. At about 200 feet I saw I was getting a little too close and I wanted to slow down a little just to lay back behind the Ford until the other two cars had met and passed each other. I applied a little air on the brakes to slow down. I found that there was no response in the brakes at all toward slowing down. I had never noticed any difficulty prior to that time. After I found no response I gave it a heavy application of air. I just figured I had not applied quite enough air to make them take hold. There was no response yet, and when I didn't get any response from the air brakes I looked down at my air gauge to see what was the matter and found there was no air in the air tank at all—the air gauge sitting on zero. I immediately started sounding my horn, large horns on top of the bus, electrically driven, and started giving short, continuous blasts of that. . . . Just about that time I pulled up on the hand brake. From the hand brake I started in trying to get over into second gear. I succeeded. In the meantime the Ford was still ahead of me. He did not make any change in his position in response to the sounding of the horn. I did not have any knowledge that the occupants of the Ford were deaf.

"The Ford and the car from the north were getting closer to each other all the time and I was getting closer to the Ford. When I noticed that it did not change its position in response to the blasts of my horn I pulled out on the right side of the road, thinking if I couldn't get him to move over I could possibly pass him on the right side. When I pulled over I saw there was a culvert there with a post sticking up which would make it impossible for me to pass on the right side. I immediately pulled clear over to the left, still sounding my horn. The car approaching from the north had gotten very close to the Ford and almost ready to pass each other. The other one then passed the Ford. In the meantime I had pulled out toward the center of the road, thinking I could possibly get him to get over to the other side, that is, the car coming from the north. He just kept coming straight ahead, following the same course. I was behind the Ford, getting closer all the time, and they met, and after this car coming from the north had gone past far enough to where looking out of the corner of my eyes I could see the back end of his car was about even with the driver's seat on the bus and he was going on south, I whirled the bus to the left just as hard as I could. To my knowledge I did not hit the back end of the Ford. I pulled out toward the left side of the road. I straightened up after I got over to the left side of the road. There was another car coming from the north at that time that I could see and I knew I would have to get over on my side of the road not to endanger him, so as soon as I got past the Ford I looked up in my mirror and saw I was past him, and I whipped back to the right side of the road. As I passed the Ford I heard a raking sound on the right-hand side. After I passed the Ford I looked up in my mirror and the Ford at that time was in the road directly behind the bus. I would say I proceeded north along the road before I stopped about 1,000 feet. After I stopped I learned that something had happened to the Ford. I saw that the Ford was over in the ditch at the west side of the road."

The plaintiff testified as follows:

"The bus was fifty to sixty feet behind us when I saw it in the rear-view mirror. I was driving on the right side of the highway and continued to drive on that side. I do not know whether our car and the bus collided. I saw the north car coming and then I saw the bus coming, trying to go around, and then it side-swiped me—the fender."

His companion testified as follows:

"At the time of the accident Randall was driving on the right side of the road. When I first saw the bus it was 400 feet back. I saw it by the reflection in the windshield and I turned around and looked at it. Randall was driving about thirty miles per hour. My judgment is that the bus was moving about fifty miles an hour. When the bus struck my car I woke up to a sudden realization that something had happened and the blue bus flashed by. Our car was going like the waves of the sea. Randall told me he was hurt through the chest and the back. I crawled out of the ditch and went over to the road. Our car was turned over with the wheels in the air."

Defendants argue, first, that their demurrer to the evidence of plaintiff, their motion for a directed verdict and their motion for judgment notwithstanding the verdict should have been sustained. The basis of this argument is that the evidence of plaintiff shows him to have been guilty of contributory negligence as a matter of law. To sustain this argument defendants point out that when the companion of plaintiff first saw the bus it was 200 feet away, approaching at a rapid rate of speed; that he called the attention of plaintiff to this and plaintiff looked back and saw the bus coming and continued on his course without giving an inch to the right. The argument is that it was negligence for plaintiff to fail to pull to the right so that the bus could have passed between the car of plaintiff and the cars coming from the north. Defendants argue that had plaintiff done this the collision could have been avoided.

In the consideration of such an argument this court considers all the evidence in the light most favorable to the plaintiff and allows all reasonable inferences in his favor. (See *Tilden v. Ash,* 145 Kan. 909, 67 P. 2d 614. See, also, *Nelson v. Peterson,* 147 Kan. 507, 78 P. 2d 20.) From the evidence in this record we cannot infer that plaintiff must have known that the bus was out of control and that the driver was not able to stop it. On the other hand, when his attention was called to it and it was 200 feet away, and later when it was fifty or sixty feet away, he had a right to assume that the driver of the bus would obey the law and slow up or stop before

it struck his car.  In *Stillwell v. Faith*, 142 Kan. 730, 52 P. 2d 635, this court said:

"A motorist in a hurry has no absolute right to require all other cars ahead of him to get out of his way.  The others have exactly the same rights as himself.  Much depends on the condition of the road, the weather and the congestion of traffic.  And even where a slower motorist refuses to steer far enough to the right to give another motorist an opportunity to pass when requested to do so by a timely sounding of the horn, the remedy for such discourtesy is not that of driving ahead to pass regardless of such a consequence as happened in the case at bar."  (p. 736.)

It would not do to hold that one who failed to drive out of the way of a car coming at a fast rate of speed from the rear was guilty of contributory negligence as a matter of law, especially in this case where the person charged with contributory negligence was well over on the right-hand side of the road.

Defendants point out that the jury was asked whether, if plaintiff had turned to the right when his companion warned him of the approach of the bus, or when he himself saw it, the bus could have passed in safety, and the jury answered "probably not."  This was equivalent to an answer in the negative.  Defendants argue that there was no evidence whatever to sustain this.  We cannot agree with this argument.  There were too many other elements to consider in answering such a question.  The whole affair was over in less than a second, and the correct answer depended on the position of the other cars and their closeness to each other and the speed at which they were being driven.  We cannot say that the undisputed evidence compelled that this question be answered in the affirmative.

Defendants next argue that even though plaintiff did not know that the air brakes on the bus would not work, still the driver of the bus was sounding blasts on his horn, and had plaintiff and his companion not been deaf they would have heard the horn and known there was an emergency and pulled to the right.  Defendants argue that, as a matter of law, a person completely deaf is not competent to operate a motor vehicle upon the highways of the state.  To sustain this argument defendants point out that plaintiff did not have a license to operate a motor vehicle, and that he was guilty of a misdemeanor for driving a car without one, and that the statutes forbid a license being issued to any person who is suffering from such a disability as would prevent him from exercising ordinary control over a car.  The statute does not forbid a deaf person being given a license to drive a car.  Whether the disability from which

plaintiff was suffering would have been sufficient grounds to warrant the vehicle commissioner in denying him a driver's license would be a question of fact. Whether the failure of plaintiff to hear the horn being sounded by the driver of the bus was the cause of the collision and whether the horn was sounded were both questions for the jury. They were answered against the contention of defendants. In *Furtado v. Bird*, 26 Cal. App. 152, 146 Pac. 58, the defendant driving an automobile overtook and collided with the plaintiff, who was riding on horseback. The plaintiff was deaf. The defendant contended that the plaintiff was guilty of contributory negligence because, being deaf, it was his duty to look back as well as forward and that if he had been doing so the accident would not have occurred. The court overruled this contention, and said:

"We do not think it was plaintiff's duty to be constantly looking back. Both parties had an equal right to the use of the road, but defendant was in the better position to avoid a collision and when he observed that plaintiff appeared not to hear the horn it was defendant's duty to slow down and even to stop his car, if necessary, to avoid running against plaintiff's horse." (p. 158.)

See, also, *McCann v. Sadowski*, 287 Pa. St. 294, 135 Atl. 207.

Defendants next argue that the trial court erred in refusing a new trial. The basis of this argument is the giving of an instruction to the jury, a portion of which was to the effect that a motorist approaching a car from the rear may not deliberately run into the car ahead. Defendants object to the use of the word "deliberately." They argue that by the use of this word the court in effect instructed the jury that it might determine that the driver in this case ran into the car of plaintiff with malice aforethought.

This is not the correct interpretation to put upon the word as it is used here. In the first place, the court told the jury in the very sentence in which the word is used that the act described would constitute negligence, not that it would constitute wantonness. In the second place, the testimony of the bus driver himself shows that he did what he did deliberately as the word is defined in the dictionary. That is, an "act formed or taken with deliberation, well advised, carefully considered." It will be remembered that the bus driver first looked to the right and concluded that he could not pass on that side, then he considered whether he could stop before he hit the Ford, then he decided to go around on the left-hand side, with the disastrous consequences that resulted. His course of conduct shows about as much deliberation as could be expected under the circumstances.

The next ground upon which defendants urge that a new trial should have been granted is misconduct of counsel for plaintiff during the closing argument. Counsel for plaintiff referred to a doctor who testified for defendants as a "doctor who followed the bus company around testifying." Defendants argue that such a statement was not true and was prejudicial to the defendants' case. The testimony of the doctor in question was on the question of the extent of the injuries suffered by plaintiff. As soon as the statement was made counsel objected to it and the trial court advised the jury in effect that they should decide the case on the evidence as they heard it from the witnesses and the law as given in the instructions. (See *Smith v. Cement Co.,* 86 Kan. 287.) Defendants do not make any point here that the verdict and judgment were excessive. We have examined the authorities furnished by defendants where language used by counsel in argument has been held to be reversible error. We find that the language used in this case was not nearly so well calculated to prejudice the rights of defendants as that in the authorities relied on.

We have concluded that the trial court committed no error in the trial of this case.

The judgment of the trial court is affirmed.